**[J-3-2017]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**EASTERN DISTRICT**


**SAYLOR, C.J., BAER, TODD, DONOHUE, DOUGHERTY, WECHT, MUNDY, JJ.**


| | |
|---|---|
| NEXTEL COMMUNICATIONS OF THE MID-ATLANTIC, INC., | : No. 6 EAP 2016 |
| | : |
| | : Appeal from the Judgment of the |
| Appellee | : Commonwealth Court entered on |
| | : December 30, 2015 at No. 98 F.R. 2012 |
| | : |
| v. | : ARGUED: April 5, 2017 |
| | : |
| | : |
| COMMONWEALTH OF PENNSYLVANIA, | : |
| DEPARTMENT OF REVENUE | : |
| | : |
| Appellant | : |


**OPINION**


**JUSTICE TODD**                                          **DECIDED: October 18, 2017**

In this direct appeal, we are called upon to determine whether the "net loss carryover" provision of the Pennsylvania Revenue Code for tax year 2007 ("NLC")[1] — which restricted the amount of loss a corporation could carry over from prior years as a deduction against its 2007 taxable income to whichever is greater, 12.5% of the corporation's 2007 taxable income or $3 million — violates Article 8, Section 1 of the Pennsylvania Constitution ("the Uniformity Clause").[2]  We affirm the Commonwealth Court's holding that the NLC, as applied to Appellee, Nextel Communications ("Nextel"), violates the Uniformity Clause.  However, we also find that the portion of the NLC which creates the violation — the $3 million flat deduction — may be severed from the remainder of the statute, while still enabling the statute to operate as the legislature

---

[1]  Act of March 4, 1971, P.L. 6, as amended, 72 P.S. § 7401(3)4.(c)(1)(A)(II).
[2]  Pa. Const. art. VIII, § 1.

intended.  Thus, we reverse the order of the Commonwealth Court eliminating any caps on net loss deductions for tax year 2007; and, correspondingly, we reverse its direction to Appellant, the Pennsylvania Department of Revenue ("Department"), to refund $3,938,220 to Nextel, which was the amount of its 2007 net income tax payment to the Commonwealth.

## I. Procedural History

Nextel, which is incorporated in the state of Delaware, is a provider of various mobile telecommunication services.  In 2007, Nextel earned $45,053,282 in taxable income on its business activities in the Commonwealth.  Under the NLC, Nextel was entitled to deduct from its 2007 taxable income the net losses it sustained in prior tax years in the amount of $3 million or 12.5% of its 2007 taxable income, whichever total was greater.  In 2007, Nextel had a cumulative net loss dating from the tax year 1997 of $150,636,792.[3]  Because 12.5% of Nextel's 2007 taxable income amounted to $5,631,660, and, hence, was greater than $3 million, Nextel claimed the 12.5% amount as a net loss deduction, thereby reducing its taxable income for 2007 to $39,421,622.  Under the corporate net income tax rate of 9.9%,[4] Nextel's total tax liability to the Commonwealth on this adjusted income was $3,938,220, which Nextel paid to the Department.

Thereafter, Nextel filed a refund claim with the Department's Board of Appeals for the full amount of its 2007 tax payment, claiming, *inter alia*, that the NLC violated the Uniformity Clause of the Pennsylvania Constitution by capping the amount of its prior net loss that it could carry over into tax year 2007 at 12.5% of its taxable income.  This

---

[3]  The Revenue Code provides that net losses sustained during tax year 1997 could be carried over during the following 10 tax years.  Beginning in tax year 1998, and for all tax years thereafter, corporations are permitted to carry over their net losses for 20 years.  72 P.S. § 7401(3)4.(c)(1)(2)(A).
[4]  *See* 72 P.S. § 7402(b).

claim was denied by the Board on the basis that it did not have the legal authority to address a constitutional challenge. Nextel then petitioned the Board of Finance and Revenue, again claiming its entitlement to a refund and asserting the right to carry over all prior net losses for use as a deduction without limitation.[5] The Board of Finance and Revenue denied the petition and rejected Nextel's constitutional argument, noting that it was not empowered to pass on questions of a taxing statute's validity under our constitution, but, rather, could only apply the law as it was written.

Nextel appealed to the Commonwealth Court, which, in a split *en banc* published decision, reversed the decision of the Board of Finance and Revenue.[6] *Nextel Communications of the Mid-Atlantic, Inc., v. Commonwealth of Pennsylvania, Department of Revenue*, 129 A.3d 1 (Pa. Cmwlth. 2015). The majority first rejected the Department's argument that, because all corporations were subject to the same statutory rate of 9.9% on their taxable income, there was no Uniformity Clause violation. The majority noted that it is the effect of the application of the particular formula or method used to calculate a tax which determines whether a Uniformity Clause violation occurs.

In considering the effect of the NLC on various corporations' taxable income, the majority determined that, as written, it allowed some corporate taxpayers — those with income of $3 million or less — to reduce their tax liability to zero in the tax year 2007, if they had prior net operating losses of $3 million or more. By contrast, it imposed tax

---

[5] Although not natural persons, our case law recognizes the entitlement of corporations, as taxpayers obligated to pay the corporate net income tax, to the protections of the Uniformity Clause. *See Turco Paint v. Kalodner*, 184 A. 37 (Pa. 1936) and *Commonwealth v. Warner Brothers Theaters*, 27 A.2d 62 (Pa. 1942), discussed *infra*.

[6] This decision was authored by Judge Brobson and joined in full by Judges McGinley, Cohn Jubelirer, Leavitt, and Covey. Then-President Judge Pellegrini filed a concurring and dissenting opinion joined by Judge Leadbetter.

liability on other corporations with income in excess of $3 million and prior net operating losses which equaled or exceeded their taxable income, because those corporations' net loss deduction was capped (at the greater of $3 million or 12.5% of their taxable income).

The majority next examined whether the NLC's application to corporate taxpayers on the basis of taxable income was reasonable, and rationally related to a legitimate state purpose. The majority observed that our Court had previously held, in *In re Cope's Estate*, 43 A. 79 (Pa. 1899) (invalidating an inheritance tax provision that exempted estates worth $5,000 or less from paying that tax), that a tax rate based on the monetary value of the property taxed, which has the effect of causing different groups of taxpayers from the same class to bear unequal burdens of taxation, or which exempts some taxpayers in the class from paying any tax at all, offends the Uniformity Clause. The majority reasoned that, because the NLC was structured to assess a corporation's tax liability on the basis of the value of a corporation's taxable income, in operation, the NLC enabled the majority of corporations with taxable income (98.8%) to avoid paying any taxes at all in 2007; but, because of the limitation on the amount of net loss carryover which a corporation was permitted to deduct, it forced a minority of those taxpayers (1.2%) to incur tax liability.[7]   The majority concluded that, because this disparate tax treatment was "based solely on asset value," the NLC was the same type of taxing statute our Court held to be forbidden under the Uniformity Clause in *Cope's Estate*, and was likewise unconstitutional. *Nextel*, 129 A.3d at 11.

---

[7]   These percentages were derived from data furnished by the Department showing that, in tax year 2007, 19,537 corporations had net loss carryover deductions which equaled or exceeded their taxable income. Of these, 234 corporations paid taxes because their taxable income apportioned to Pennsylvania exceeded the $3,000,000 flat deduction allowed by the NLC. *See* Exhibit D to Parties' Stipulation of Facts, 3/17/15, (R.R. at 43a).

The majority was unpersuaded by the Department's argument that the General Assembly was justified in limiting the amount of loss from a prior tax year which a corporation could carry over because of budgetary concerns that an unlimited deduction would result in too much lost revenue. The majority acknowledged the General Assembly's right to limit such deductions, but viewed this right as constrained by the fundamental requirement that any such limitation comport with the Pennsylvania Constitution, and, thus, in the majority's view, this concern could not excuse the NLC's violation of the Uniformity Clause.

Having determined that the NLC was unconstitutional, the majority next turned to the issue of the appropriate remedy. The majority refused to strike the NLC in its entirety from the Revenue Code as suggested by the Department, reasoning that Nextel had not made a facial challenge to the constitutionality of the NLC, nor, in reaching its decision, had the court found the NLC to be facially unconstitutional. Instead, the majority noted that Nextel had claimed only that the NLC was unconstitutional as applied to it for the 2007 tax year, and, thus, the majority concluded that the appropriate relief should be limited to remedying the improper application of the NLC to Nextel's taxable income for that tax year.

Observing that the Uniformity Clause and the Equal Protection Clause of the United States Constitution have generally been analyzed in the same fashion, the majority found guidance from cases in which a taxpayer successfully established that a state engaged in discriminatory enforcement of its taxing laws, resulting in the taxpayer paying more than other similarly situated taxpayers, and, as a remedy, the taxpayer was afforded relief from the improperly assessed additional tax liability. *See Nextel,* 129 A.3d at 12-13 (citing *Commonwealth v. Molycorp*, 392 A.2d 321 (Pa. 1978) (after successful challenge by corporation under the Uniformity Clause to the Department's

selective imposition of tax penalties for underpayment of corporate taxes against one group of corporate taxpayers, our Court determined that the proper remedy was to reverse the Department's assessment of a penalty against the corporation); *Iowa-Des Moines National Bank v. Bennett*, 284 U.S. 239 (1931) (bank which was successful in its equal protection challenge to county taxing authority's assessment of taxes on it at a higher rate than its competitors was entitled to a refund of the extra taxes it had paid, and it was not a sufficient remedy to require the bank to seek to compel the collection of additional taxes against its competitors, or to wait for the taxing authority to collect the additional taxes of its own volition); *Tredyffrin-Easttown School District v. Valley Forge Music Fair, Inc.*, 627 A.2d 814 (Pa. Cmwlth. 1993) (business that successfully challenged enforcement of amusement tax ordinance which resulted in it paying more in taxes than other similarly situated businesses was entitled to a refund of the excess taxes it paid)).

The majority reasoned that, like the taxpayers in those cases, Nextel established that it was subject to unequal treatment *vis-a-vis* other corporate taxpayers and was entitled to a similar remedy. While acknowledging that it could strike the flat $3 million deduction for the 2007 tax year, which would then make the 12.5% deduction uniformly apply to all corporate taxpayers, it rejected that alternative as, in its view, this would not correct the constitutional violation suffered by Nextel and "would only serve to highlight the fact that, while Nextel paid what it was supposed to pay, many corporate net income taxpayers in the 2007 Tax Year benefitted from the discriminatory cap and thus *underpaid* their corporate net income taxes — i.e., benefitted from the unconstitutional provision." *Nextel,* 129 A.3d at 13 (emphasis original). The majority thus viewed the "only practical solution" to be to allow Nextel to use its prior operating losses to reduce its corporate taxable income to zero in the 2007 tax year, and, thus, pay no taxes, just

as did 98.8% of corporations in that tax year — i.e., those with $3 million or less of taxable income and an equivalent or greater amount of prior net loss deductions for that tax year. *Id.*

The majority, perceiving there would possibly be significant deleterious revenue consequences to the Commonwealth of its decision, attempted to limit its scope "to the [Department], Nextel and the 2007 Tax Year." *Id.* The majority further opined that, "[t]o the extent our decision in this as-applied challenge calls into question the validity of the NLC deduction provision in any other or even every other context, the General Assembly should be guided appropriately." *Id.* In accordance with its decision, the Commonwealth Court entered an order directing the Department to refund to Nextel the $3,938,230 it had paid in corporate net income tax for tax year 2007.

Then-President Judge, now-Judge, Pellegrini authored a concurring and dissenting opinion which was joined by Judge Leadbetter. While agreeing with the majority that the NLC violated the Uniformity Clause, Judge Pellegrini dissented from the majority's proposed remedy. Judge Pellegrini disagreed that the majority's decision could be restricted in its effect only to a determination of the amount of tax Nextel owed for tax year 2007. By contrast, he viewed the majority's characterization of Nextel's challenge as being an "as applied" one to be irrelevant to the impact of its holding, inasmuch as he viewed the practical effect of the court's decision as allowing all corporate taxpayers to, henceforth, take an unlimited net loss carryover deduction.

Judge Pellegrini opined that he would, instead, apply Section 1925 of the Statutory Construction Act of 1972 ("SCA"), 1 Pa.C.S. § 1925, which allows courts to sever unconstitutional provisions of a statute from the remaining constitutional portions "unless the court finds that the valid provisions . . . are so essentially and inseparably connected with, and so depend upon, the void provision . . . that it cannot be presumed

the General Assembly would have enacted the remaining valid provisions without the void one; or . . . that the remaining valid provisions, standing alone, are incomplete and are incapable of being executed in accordance with the legislative intent." 1 Pa.C.S. § 1925.  Judge Pellegrini noted that the structure of the NLC, and similar net loss carryover provisions in the Revenue Code for subsequent tax years 2009, 2010, 2014 and 2015,[8] reflected the General Assembly's intent to limit the net loss carryover deduction a corporation could utilize in each tax year by capping it.  Consequently, in

---

[8]  These sections provide, in full:

>(c)(1) The net loss deduction shall be the lesser of:
>
>(A)(I) For taxable years beginning before January 1, 2007, two million dollars ($2,000,000);
>
>(II) For taxable years beginning after December 31, 2006, the greater of twelve and one-half per cent of taxable income as determined under subclause 1 or, if applicable, subclause 2 or three million dollars ($3,000,000);
>
>(III) For taxable years beginning after December 31, 2008, the greater of fifteen per cent of taxable income as determined under subclause 1 or, if applicable, subclause 2 or three million dollars ($3,000,000);
>
>(IV) For taxable years beginning after December 31, 2009, the greater of twenty per cent of taxable income as determined under subclause 1 or, if applicable, subclause 2 or three million dollars ($3,000,000);
>
>(V) For taxable years beginning after December 31, 2013, the greater of twenty-five per cent of taxable income as determined under subclause 1 or, if applicable, subclause 2 or four million dollars ($4,000,000);
>
>(VI) For taxable years beginning after December 31, 2014, the greater of thirty per cent of taxable income as determined under subclause 1 or, if applicable, subclause 2 or five million dollars ($5,000,000).

72 P.S. § 7401(3)4.(c)(1)(A)(1)-(VI).

Judge Pellegrini's view, the majority's decision to eliminate all caps on the amount of net loss a corporation could carry over was directly contrary to this legislative intent. Judge Pellegrini pointed out, however, that in each of these net loss carryover provisions of the Revenue Code, the flat dollar deduction could be severed from the percentage deduction, thereby leaving the percentage deduction available to all taxpayers. Judge Pellegrini deemed this to be the most appropriate course of action as it would carry out the legislative intent to limit net loss carryover deductions for a given tax year, while also protecting the public purse.

The Department filed a direct appeal with our Court, raising two issues: (1) whether the NLC violates the Uniformity Clause by capping the amount of net loss deduction a corporation can take based on its income, and (2) if so, whether severance of the $3 million flat deduction cap is the appropriate remedy, rather than allowing an unlimited net loss deduction as did the Commonwealth Court.[9] In our order granting oral argument, we also directed the parties to further brief the effect, if any, of our Court's recent opinion in *Mount Airy #1, LLC v. Pennsylvania Department of Revenue*, 154 A.3d 268 (Pa. 2016) ("*Mt. Airy*"), which declared portions of the local tax assessment on casino revenue in the Gaming Act violative of the Uniformity Clause. *Nextel v. Pennsylvania Department of Revenue*, 6 EAP 2016 (Pa. filed Oct. 16, 2016) (order).

## II. Analysis

### A. Uniformity Clause Challenge

The Department argues that the Commonwealth Court incorrectly held that the NLC violates the Uniformity Clause by erroneously measuring uniformity based on the

---

[9] As these are questions of law, our standard of review is *de novo*, and our scope of review is plenary. *Wirth v. Commonwealth*, 95 A.3d 822, 836 (Pa. 2014).

effective corporate income tax rate, *i.e.*, the actual rate of tax the corporate taxpayer paid on its income,[10] rather than the statutory corporate net income tax rate of 9.9%. The Department asserts that our Court has held that a corporate income tax statute does not violate the Uniformity Clause if it applies the same rate of taxation to the same tax base, even if certain income is excluded from that tax base for some corporations because of their individual circumstances. In support of this proposition, the Department relies on *Turco Paint*, *supra* (holding that, even though a Pennsylvania corporate excise tax calculated based on 3 factors — the corporation's gross receipts from Pennsylvania, its Pennsylvania payroll, and the physical property it owned in Pennsylvania — resulted in different tax liabilities for different corporations due to the fact these three factors were dissimilar for each corporation, this variance did not violate the Uniformity Clause, because the taxing statute imposed the same rate — 6% — on the same tax base for each corporation), and *Warner Brothers*, *supra* (holding that 10% excise tax applied to all corporations based on the corporation's net income under the federal tax code did not violate the Uniformity Clause, even though, under the federal tax code, the amount of capital deductions which a corporation could claim was limited and would vary from year to year, inasmuch as the tax base for all corporations was the same, and subject to the same 10% tax rate).[11] Thus, in the Department's view, these

---

[10] The effective tax rate, generally, is computed by taking the actual amount of income tax the corporate taxpayer paid in a tax year and dividing it by the amount of the corporation's taxable income for that year. *Black's Law Dictionary* 1691 (10th ed. 2014).

[11] The current corporate net income tax statute, like these predecessor statutes, characterizes the nature of the tax imposed as an excise tax, *see* 72 P.S. § 7402(a), but this designation is merely semantical, as we have subsequently endorsed the proposition that, despite this description, the true nature of the tax is "a direct tax on corporate net income." *C.C. Collings & Company, Inc. v. Commonwealth*, 488 A.2d 1187, 1193 (Pa. Cmwlth. 1985), *aff'd on the basis of the Commonwealth Court opinion*, *Commonwealth Securities and Investments, Inc. v. Commonwealth*, 514 A.2d 1373 (Pa. 1986).

cases establish that, where, as here, a uniform tax rate is applied to the same tax base — which for a corporation it considers to be its net taxable income — there is no Uniformity Clause violation.

The Department recognizes that our Court has found other types of taxes which exclude from their tax base varying amounts of property to be violative of the Uniformity Clause, because their operation resulted in members of the same class of taxpayers paying unequal amounts of taxes. Department Brief at 18-20 (citing *Amidon v. Kane*, 279 A.2d 53 (Pa. 1971) (personal income tax which was levied on a taxpayer's taxable income, as defined under the Internal Revenue Code, which resulted in individual taxpayers having various portions of their income exempted from taxation, violated the Uniformity Clause), and *Clifton v. Allegheny County*, 969 A.2d 1197 (Pa. 2009) (property tax assessment scheme that used an outdated base year valuation method, which undervalued some properties not reassessed since that base year, while assigning a higher market value to similar properties assessed after the base year, thereby resulting in the more recently assessed homeowners paying higher amounts of property taxes than those with base year assessments, contravened the Uniformity Clause)).

However, the Department views those cases as distinguishable from the case at bar, contending that our Court, in *Turco* and *Warner Brother*s, has explicitly sanctioned the use of a different uniformity analysis with respect to corporate taxes, as opposed to income taxes, due to the way corporations operate. The Department notes that corporations are created for the purposes of producing profits, and deductions from corporate income, which are costs associated with producing that income, are applied first to establish the tax base before any uniformity analysis is conducted. The Department avers that, in those situations, the uniformity analysis merely considers

whether the tax is imposed on that base at a fixed statutory rate, and, if so, the uniformity analysis comes to an end. However, the Department contends that individuals behave differently, and there is no necessity of determining their tax base by considering the costs of producing their income; rather, the deductions or exemptions are applied to compute the tax owed.

The Department avers that the corporate income tax structure is also distinct from the estate tax at issue in *Cope's Estate*, as all corporate taxpayers pay the same rate, while in that case the tax at issue was what it characterizes as a "classically graduated" tax where the rate of taxation increased based on the value of an estate. Department Brief at 22. The Department also notes that a number of other taxes, such as excise or occupation taxes, have uniform tax rates for all taxpayers, yet, when applied, produce unequal tax burdens for taxpayers who pay them, because they produce an effective rate of taxation which varies by income, since people with lower incomes pay a greater proportion of their income as the result of these taxes. The Department contends that the effect of the Commonwealth Court decision calls into question the constitutionality of these taxes, as well as other income taxes that utilize deductions in the federal tax code as a basis to compute taxable income, which again results in a variable tax rate for taxpayers dependent on which deductions they claim.

Alternatively, the Department argues that, even if the $3 million flat deduction implicates uniformity, it nevertheless is constitutional because the Uniformity Clause requires only substantial, not perfect, uniformity. The Department claims that, because only 234 out of 19,537 corporations (1.2%) were unable to reduce their taxable income to $0 since their income was above $3 million, and because those corporations were still able to take a net loss deduction, the NLC deduction provision was "as nearly

uniform as practicable," and thus satisfied the constitutional requirement of "rough uniformity." Department Brief at 24.

With respect to *Mt. Airy*, the Department argues that the issue in this case is fundamentally different from the question presented in that case, which concerned a challenge under the Uniformity Clause to the statutory tax rate, rather than a uniformity challenge to the calculation of the tax base, as in this case. Thus, the Department maintains that *Mt. Airy* did not address any issue involving a calculation of the tax base, noting that our Court specifically avoided opining on whether a uniformity violation could arise out of disparate effective tax rates. The Department also points out that our Court recognized in *Mt. Airy* that the Uniformity Clause allows "a bit more flexibility in the context of corporate taxation," which the Department suggests counsels against finding a uniformity violation in this instance. Department Supplemental Brief at 7 (quoting *Mount Airy*, 154 A.3d at 277).[12]

In response, Nextel maintains that, as the Commonwealth Court determined, the NLC violates the Uniformity Clause because it allows corporations with net loss carryover in excess of their 2007 income to deduct their losses without limitation if they have $3 million or less in taxable income, and thereby reduce their taxable income to

---

[12] The Majority Caucus of the Pennsylvania House of Representatives has filed an *amicus* brief which largely tracks the arguments of the Department on this issue. The Majority Caucus additionally criticizes the Commonwealth Court for focusing on the "divergent tax burdens" on corporations which application of the tax will produce, Majority Caucus Brief at 12 (quoting *Nextel*, 129 A.3d at 9), rather than the statutorily imposed rates of taxation and the statutorily provided amount of the NLC deduction, both of which it contends are uniform. The Majority Caucus echoes the Department's concerns regarding the impact of the Commonwealth Court decision on a number of other taxes which, although having uniform tax rates, result in unequal tax burdens for taxpayers in application based on the taxpayers' income. The Majority Caucus agrees with the Department that the effect of the Commonwealth Court decision calls into question the constitutionality of these taxes, and other income taxes which utilize deductions in the federal tax code as a basis to compute taxable income.

$0, while limiting the amount of loss that corporations with over $3 million in taxable income may deduct, obligating those corporations to pay some income tax. Nextel notes that our Court has held tax laws which, although imposing a uniform rate of tax, provide "dollar-value thresholds for exemptions and deductions" from the tax, to be violative of the Uniformity Clause because they resulted in similarly situated taxpayers shouldering unequal burdens of taxation. Nextel Brief at 9-12 (citing *Cope's Estate*, *supra*, and *Kelley v. Kalodner,* 181 A. 598 (Pa. 1935) (personal income tax which provided for a flat exemption from taxation for single taxpayers with taxable income below $1,000, and below $1,500 for married taxpayers, violated the Uniformity Clause). Nextel asserts that the NLC's $3 million limitation operates the same as this type of dollar value threshold.

Addressing the Department's contention that there is no Uniformity Clause violation because the same statutory rate of 9.9% is applied to the same tax base, Nextel disputes that the tax base — what it considers to be a corporation's taxable income — is the same for it and all other corporate taxpayers, because the $3 million limit on net loss carryover deductions led to it and 26 other corporate taxpayers having taxable incomes, whereas 19,303 other corporate taxpayers with income falling under the $3 million limit and net loss carryovers in excess of their income had no taxable income.

Nextel also disputes the Department's assertion that the NLC is constitutional under our holding in *Turco Paint*, reasoning that, under the taxing statute in that case, every corporate taxpayer was taxed on the same tax base, namely, the amount of its income which could be apportioned to Pennsylvania. Nextel also discounts the applicability of *Warner Brothers* on the grounds that the constitutional issue in that case was whether the legislature unconstitutionally delegated its taxing authority to Congress

by using corporate net income as determined by the federal tax code, with all allowable deductions, as the tax base for the corporate income tax.

Nextel proffers that our Court recognized in *Amidon* that, even though a taxing statute imposes a flat rate of taxation on income, it may nevertheless operate in a manner which causes a disparity in the effective tax rate paid by various groups of taxpayers subject to the tax, and that the difference in effective tax rates may trigger a Uniformity Clause violation. Nextel notes that, in *Amidon*, the personal income tax statute at issue in that case, which used taxable income as the tax base, defined such income in the same manner as the federal tax code that allowed various exemptions and deductions. Because the amount of a person's taxable income varied widely from taxpayer to taxpayer, depending on which deductions he or she elected to take because of his or her lifestyle, the effective rate of taxation he or she was subject to also varied widely, thereby violating uniformity. Nextel contends that the NLC likewise operates to subject it and the 26 other corporations which paid corporate income taxes to a higher effective rate of taxation — 8.74% — whereas 19,303 other corporations paid an effective tax rate of 0%.

Nextel also argues that the NLC deduction provision does not satisfy "rough uniformity" due to the disparity between its effective tax rate and the effective tax rate of the majority of other Pennsylvania corporations. Specifically, Nextel maintains that rough uniformity means that immaterial deviations are permitted, but asserts that the difference between a tax rate of 8.74% and a tax rate of zero cannot be considered an immaterial deviation.

Regarding our *Mt. Airy* decision, Nextel asserts that its holding is directly applicable to this case, as *Mt. Airy* involved a tax which classified casinos based solely on the quantity of their receipts, inasmuch as casinos with receipts over $500 million

paid a 2% tax, while casinos with receipts of $500 million or less paid a flat $10 million tax; Nextel avers this framework is similar to the tax in the instant case which classifies corporations based upon the quantity of their income. Nextel notes that, in *Mt. Airy*, our Court concluded that "such quantitative distinctions lack uniformity because any 'classification that is based solely on a difference in quantity . . . is necessarily unjust, arbitrary, and illegal.'" Nextel's Supplemental Brief at 6 (quoting *Mt. Airy*, 154 A.3d at 277). Nextel maintains that we should reach the same conclusion in this case, emphasizing that, although we have recognized that the Uniformity Clause allows more flexibility in the corporate context, we have never permitted tax classifications between corporations based on the quantity of their property.[13]

---

[13] A variety of *amici* have filed briefs in support of Nextel's position on this issue, respectively: the Council on State Taxation; the Institute for Professionals in Taxation; the Pennsylvania Business Council; the Greater Philadelphia Chamber of Commerce; the Greater Pittsburgh Chamber of Commerce; and the Pennsylvania Chamber of Business and Industry. All *amici* express agreement with Nextel's legal analysis as to why the NLC violates the Uniformity Clause, and the Council on State Taxation echoes Nextel's contention that our decisions in *Kelley* and *Amidon* established that the Uniformity Clause applies both to the rate of taxation imposed by a taxing statute, as well as to the tax base as determined by measuring the effective tax rates for various taxpayers within the same class.

    *Amici* from the various Chambers of Commerce and the Chamber of Business and Industry also advance the policy argument that restrictions on deductions for net losses which target only large companies discourage those companies from making expensive capital investments and undertaking costly research, contending they are usually the only ones fully capable of funding such research. *Amici* argue that such endeavors often cause those companies to sustain significant losses, and *amici* contend those companies should be able to fully deduct such losses against their income over a longer period of time than just one tax year, particularly if they are operating in industries susceptible to highly cyclical profit variability, which can abruptly reduce a corporation's income for a particular tax year. *Amici* assert that the imposition of a cap on how much loss can be carried over from year to year by large companies interferes with their ability to more readily absorb these losses as part of their long-term operations, as it restricts them from fully using those losses for years when they are more profitable.

Having discussed the arguments of the parties, we begin our analysis of this issue. The relevant constitutional provision at issue in this appeal — better known by its colloquial description, "the Uniformity Clause"— is Article 8, Section 1 of the Pennsylvania Constitution, which provides:

> All taxes shall be uniform, upon the same class of subjects, within the territorial limits of the authority levying the tax, and shall be levied and collected under general laws.

Pa. Const. art. 8, § 1.

This provision was part of a larger package of constitutional provisions the people of the Commonwealth approved in adopting the "Reform Constitution" of 1874 for the purpose of altering certain legislative practices which had become commonplace during the 19th century, but which, by the latter part of that century, had fallen into serious disfavor with the populace, who rightly perceived that these practices were intended to advance private or personal interests at the expense of the public's welfare.[14] *Pennsylvania State Association of Jury Commissioners*, 64 A.3d 611, 615 n.9 (Pa. 2013). The Uniformity Clause, the language of which has remained unchanged since its initial ratification by the voters, was a direct response to the legislative use of special tax laws applicable only to particular industries or individuals.[15] [16] Robert E. Woodside, *Pennsylvania Constitutional Law* 576 (1985).

---

[14]  These practices included: the passage of local and special laws to confer special benefits or legal rights to particular individuals, corporations, or groups, benefits which were not afforded the general public; deceptive titling of legislation to mask its true purpose; the mixing together of various disparate subjects into one omnibus piece of legislation; and holding quick votes on legislation which had been changed at the last minute such that its provisions had not been fully considered by members of both houses.

[15]  At the time of its enactment, the Uniformity Clause was located in Article 9, Section 1 of the Constitution.

[16]  There have been two proposals to amend the Uniformity Clause since its inclusion in the Constitution in order to allow progressive rates of taxation, one in 1913 and one in (continued…)

The use of such special tax laws in Pennsylvania to favor particular industries began in the early part of the 19th century as part of a broader effort underway at the time by many state governments to foster "internal improvements" within their borders, *i.e.*, the construction of large physical transportation infrastructures such as canals, locks, dams, and ports on rivers to support the development of industries such as agriculture, coal mining, and timbering, and, later, as the Industrial Revolution came to America, iron and steel production. 1 Wade G. Newhouse, *Constitutional Uniformity and Equality in State Taxation*, 1731-32, 1735-37 (2d. ed. 1984). Although the Pennsylvania legislature directly financed many of these ventures for the benefit of private industries through bond issues which were repaid through tax dollars, it also provided indirect subsidies by bestowing upon these industries preferential tax treatment. *Id.* at 1203-04.

Most notably, a primary beneficiary of support from our Commonwealth's public fisc was the railroad industry, which received generous assistance from the General Assembly through the appropriation of funds for the construction of railroad lines, and the direct award of charters to individuals for the creation and exclusive operation of railroad companies in certain geographic areas. Harold E. Cox and John F. Myers, *The Philadelphia Traction Monopoly and The Pennsylvania Constitution of 1874*: *The Prostitution of an Ideal,* Journal of Pennsylvania History vol. 35, no. 4, 1 (1968). By the era of the Civil War, the railroad companies had acquired such influence over the Pennsylvania legislature that they routinely obtained the passage of special legislation

---

(…continued)
1928, but both were rejected by the voters of the Commonwealth. The voters did, however, approve constitutional amendments allowing the legislature to grant special tax treatment for forest and agricultural preserves, as well as for individuals in need of special tax treatment due to their "age, disability, infirmity or poverty." Pa. Const. art. 8, § 2

advancing their interests.  *The Railroad in Pennsylvania*, Explore Pa. History, *at* *http://explorepahistory.com/story.php?storyId=1-9-10&chapter=1*.[17]  In the field of taxation, the railroads were particularly successful at securing special tax legislation through the efforts of their lobbyist Simon Cameron, who later became President Lincoln's Secretary of War, such that, in 1861, the legislature voted to exempt them *entirely* from taxation.  *Simon Cameron Historical Marker*, Explore Pa. History, *at* http://explorepahistory.com/hmarker.php?markerId=1-A-3ADExplore.

There was considerable popular anger generated by such preferential tax treatment, as it was perceived that the burdens of taxation, and its benefits, were not being equally shared.  This anger fueled the clamor for a constitutional convention dedicated to constraining the power of the legislature to enact preferential local and special legislation, which the legislature ultimately acquiesced to by authorizing the constitutional convention of 1872-1873.  Donald Marritz, *Making Equality Matter (Again): The Prohibition Against Special Laws in the Pennsylvania Constitution*, 3 Widener J. of Pub. L. 161, 191 (1993).  The Uniformity Clause was, thus, the specific remedy fashioned by the delegates to that convention to eliminate the power of the legislature to enact special tax legislation, and its paramount purpose in requiring uniformity of taxation "was to prevent certain groups from having to shoulder the burden of progress from which all would benefit."  Kristen E. Hickman, *The More Things Change, The More They Stay the Same:  Interpreting the Pennsylvania Uniformity Clause*, 62 Alb. L. Rev. 1965, 1704 (1999); *see also Fox's Appeal*, 4 A. 149, 153 (Pa. 1886) ("[The Uniformity Clause] was intended to and does sweep away forever the power of the legislature to

_____

[17]  Explorepahistory.com, an online resource for information about Pennsylvania history, was cooperatively created, and is currently maintained, by the Pennsylvania Historical and Museum Commission, various academic bodies — including the Pennsylvania State University — Pennsylvania historical associations, and the Pennsylvania Public Television Network.

impose unequal burdens upon the people under the form of taxation. The evils which led up to its incorporation into the organic law are well known. The burden of maintaining the state had been, in repeated instances, lifted from the shoulders of favored classes, and thrown upon the remainder of the community.").

The language of the Uniformity Clause chosen by the framers of the 1874 Constitution requires uniformity of taxation on "the same class of subjects." Pa. Const. art. 8, § 1. It was unique in that it was the first such clause of any state constitution to require uniformity within classes of the subjects of taxation. Newhouse, *supra*, at 1713. Accordingly, the Uniformity Clause does not deprive the General Assembly of its power to create reasonable classifications of subjects of taxation:

> Classification for the purpose of taxation may be based on the existence of differences recognized in the business world, on the want of adaptability of the subjects to the same method of taxation, upon the impracticability of applying to them the same methods so as to produce justice and reasonably uniform results, or upon well grounded considerations of public policy.

*Appeal of Borough of Aliquippa*, 175 A.2d 856, 863 (Pa. 1961). However, consistent with the framers' intent to ensure that future tax obligations would be borne equally by all those who are required to meet them, the Uniformity Clause mandates that "there must be no lack of uniformity within the class, either on the given subject of the tax or the persons affected as payers." *Saulsbury v. Bethlehem Steel Co.*, 196 A.2d 664, 666 (Pa. 1964).[18]

---

[18] The Uniformity Clause does not, however, require that each taxpayer in a particular class pay the same dollar amount in taxes, only that the tax obligation imposed by a particular tax be borne evenly by each member of the class. The actual amounts paid by each taxpayer will, of course, vary based on the actual value of his or her income or property subject to the tax. *See Turco Paint*, 184 A. at 40 ("[T]he same [tax], when applied to the same subject-matter, does not make the tax graded [in violation of the Uniformity Clause] simply because of the fact that one association, owning more of the (continued…)

Although the paramount purpose of the Uniformity Clause is to ensure that all tax laws produce equality in the assignment of the tax burden within a particular class, it does not require absolute equality or perfect uniformity in this regard. Rather, if there is "substantial uniformity, which means as nearly uniform as practicable in view of the instrumentalities with which and subjects upon which tax laws operate," the constitutional requirement has been met. *Clifton*, 969 A.2d at 1210 (*quoting Delaware, L. & W. R. Co.'s Tax Assessment*, 73 A. 429, 430 (Pa. 1909)). All courts have a duty "in dealing with this subject to enforce as nearly as may be equality of burden and uniformity of method in determining what share of the burden each taxable subject must bear." *Id.* Consequently, when "a tax law directly, necessarily, and intentionally creates an inequality of burden, it . . . becomes imperative to inquire whether this inequality, thus intentionally created, can find any constitutional justification." *Cope's Estate*, 43 A. at 81.

When such inequality is created by a law which, by its structure, divides the subjects of a particular tax into various classes, the standard to be used in determining whether the law violates the Uniformity Clause is "whether the classification is based upon some legitimate distinction between the classes that provides a non-arbitrary, reasonable, and just basis for the disparate treatment." *Mount Airy*, 154 A.3d at 274. In light of the presumption that the legislature does not intend to violate the Constitution of the United States or Pennsylvania in enacting legislation, 1 Pa.C.S. § 1922(3), the burden of proof is on the taxpayer to show that the tax clearly, palpably, and plainly violates the Constitution by demonstrating that no reasonable distinction exists between

(…continued)
particular taxable subject-matter than another, pays, on this account, a greater sum total of tax.").

the classes. *Allegheny County v. Monzo*, 500 A.2d 1096, 1101 (Pa. 1995); *Clifton*, 969 A.2d at 1211.

For over a century, our Court has steadfastly adhered to an interpretation of the Uniformity Clause that classifications based solely upon the quantity or value of the property being taxed are arbitrary and unreasonable, and, hence, forbidden. *See Cope's Estate*, 43 A. at 81 ("A pretended classification, that is based solely on a difference in quantity of precisely the same kind of property, is necessarily unjust, arbitrary, and illegal."); *Kelley*, 181 A. at 602 ("[A] tax which is imposed at different rates upon the same kind of property, solely on the basis of the quantity involved, offends the uniformity clause."); *Mt. Airy*, 154 A.3d at 275 ("The basic principle that '[t]he money value of any given kind of property . . . can never be made a legal basis of subdivision or classification for the purpose of imposing unequal burdens on [similarly situated classes,' has endured through the years." (citation omitted and alteration original)).

In accordance with this principle, our Court has consistently viewed as unconstitutional tax laws which, although applicable to an entire class of taxpayers, wholly exempt some of those taxpayers from paying the tax. Such statutes are generally structured so that some taxpayers whose total income or value of their property falls below the maximum value of the exemption are required to pay no taxes at all, whereas other taxpayers with income or property value in excess of the exempted amount are required to pay taxes on the value of the non-exempted income or property, thus shouldering the entire tax burden. This contravenes the Uniformity Clause's paramount tenet that the tax burden should be borne equally by all those who are obligated to pay a tax. *See Cope's Estate*, 43 A. at 81 (The limitations on the legislature's ability to exempt property from taxation under the Uniformity Clause "are plainly intended to secure, as far as possible, uniformity and relative equality of taxation,

by prohibiting, generally, the exemption of a certain part of any recognized class of property, and subjecting the residue to a tax that should be borne uniformly by the entire class.").

Thus, in *Cope's Estate*, we determined that an express exemption from inheritance tax for estates worth $5,000 or less was prohibited by the Uniformity Clause, due to the fact that taxpayers with estates below $5,000 in value paid no inheritance tax, while the remainder of taxpayers with estates with value in excess of that amount, 90-95% of taxpayers were required to pay the tax. Likewise, in *Kelley,* we determined that, because the personal income tax statute at issue in that case provided for a flat exemption from taxation for those with income under a certain threshold ($1,000 for single taxpayers and $1,500 for married taxpayers), it was violative of the Uniformity Clause, as those taxpayers whose incomes fell below those threshold amounts paid no tax, while the rest of taxpayers who earned greater than those amounts were required to pay the tax. Our Court further opined therein that the General Assembly's purpose in providing the exemptions may have been laudable as a matter of public policy; however, salutary policy objectives did not excuse the constitutional violation:

> There can be no doubt that these exemptions were inserted for the purpose of putting the burden of the tax upon those most able to bear it, but it results in taxing those whose incomes arise above a stated figure merely for the reason that in the discretion of the Legislature their incomes are sufficiently great to be taxed. It is obvious that the application of the tax is not uniform. Although in the present case the exemption appears to be reasonable, the principle of inequality involved, if once established, might lead to grossly unfair results in the future.

*Kelley*, 181 A. at 602.

In more recent decisions, our Court has continued to adhere to the view that the Uniformity Clause prohibits taxes which, by their language, specifically exempt certain

individuals subject to a tax from the obligation to pay it based on the taxpayer's income. *See*, *e.g.*, *Saulsbury* (occupational tax ordinance which imposed a flat fee of $10 on all taxpayers earning over $600 violated the Uniformity Clause by exempting those making less than that amount from the obligation to pay the tax). Indeed, even in a situation where the statute imposing the tax did not explicitly exempt certain individuals from paying it, but, through its structure and operation, effectively guaranteed that some individuals would be entirely excused from paying any share of the tax burden, our Court has also found the tax to be in violation of the Uniformity Clause. *See Amidon*, 279 A.2d at 60 (holding that the Pennsylvania personal income tax statute, which imposed a flat 3-1/2% tax on taxable income, but also incorporated the definition of an individual's taxable income used by the United States Internal Revenue Code, violated the Uniformity Clause because the federal definition of taxable income "already reflects the federal personal exemptions for the taxpayer and his qualified dependents. Thus, built-in to the [Pennsylvania Income Tax] are *[e]xactly the same elements of nonuniformity* as were condemned in both *Kelley* and *Saulsbury*." (emphasis original and citation omitted)).[19]

With these principles in mind, we turn to the statute at issue in this case. The NLC establishes the following limits on the monetary value of a corporation's net loss deduction from its income for tax year 2007:

> (A)(II) For taxable years beginning after December 31, 2006, the greater of twelve and one-half per cent of taxable income

---

[19] As further noted by Justice Pomeroy in his concurrence in *Amidon*, these personal exemptions were available only to individuals under the federal tax code which that version of the Pennsylvania personal income tax statute utilized, but not to corporations; in his view this distinguished the matter from the Pennsylvania corporate net income tax at issue in *Turco Paint* and *Warner Brothers* which allowed all corporations to take the same deductions permitted them under the federal tax code. *See Amidon,* 279 A.2d at 67-69 (Pomeroy, J., concurring).

> as determined under subclause 1 or, if applicable, subclause 2 or three million dollars ($3,000,000);

72 P.S. § 7401(3)4.(c)(1)(A)(II).

In determining whether this statute violates the Uniformity Clause, we do not look at its language in a vacuum; rather, we also examine how it functions when applied to establish a corporation's net income tax liability. *See Mount Airy*, 154 A.3d at 277 ("The Pennsylvania Constitution prohibits any 'method or formula for computing a tax' that will, '*in its operation or effect*, produce arbitrary, unjust, or unreasonably discriminatory results.'" (quoting *Clifton*, 969 A.2d at 1211) (emphasis added)). Consequently, although the NLC is not worded in the same fashion as the taxing provisions at issue in *Cope's Estate*, *Kelley*, and *Saulsbury*, in that it does not explicitly exempt income below a certain threshold from taxation like the taxing statutes in those cases, nonetheless it operates in a manner that creates the very same type of exemption from taxation solely on the basis of income, a scheme we determined in those decisions to be violative of the Uniformity Clause.

Under its terms, the NLC allows any corporation with taxable income of $3 million or less in 2007 to fully deduct all net losses carried over from prior years up to the entire amount of its taxable income. As a result, such corporations pay no corporate net income taxes, given that the statutory tax rate of 9.9% is ultimately applied only to a corporation's net income. 72 P.S. § 7402(b). Thus, the NLC gives corporations with $3 million or less in taxable income, and carryover losses equaling or exceeding their taxable income, a *de facto* total exemption from paying the corporate net income tax. By contrast, corporations with taxable income over $3 million are not permitted to exempt their entire income from taxes, even if, like Nextel, they have sufficient net losses from prior years to offset it. Instead, such corporations are limited in the amount of prior net losses they can claim to the greater of 12.5% of their taxable income or $3

million, thereby requiring them to pay the corporate net income tax of 9.9% on the remaining portion of their taxable income.

It is clear, then, that the NLC, by allowing corporations to take a flat $3 million net loss carryover deduction against their taxable income, has effectively created two classes of taxpayers among corporations which have net loss carryover deductions equal to or exceeding their taxable income. The first and larger class, comprising 98.8% of all corporate taxpayers for tax year 2007, was exempted from paying any corporate net income tax simply because their income was $3 million or less, and a much smaller class of corporate taxpayers, 1.2%, was required to shoulder the entire corporate net income tax burden for that tax year due only to the fact that each of those class members had income in excess of $3 million. Because the NLC has created disparate tax obligations between these two classes of similarly situated taxpayers based *solely* on the value of the property involved — *i.e.*, the amount of each class member's taxable income — it is, as the Commonwealth Court determined, an arbitrary and unreasonable classification which is prohibited by the Uniformity Clause. *See Cope's Estate*, 43 A. at 81 (inheritance tax exemption which created two classes of individuals who inherited property — those who acquired estates with value less than $5,000 and were exempt from paying taxes, and those taxpayers whose estates were valued in excess of $5,000 who were required to pay inheritance tax — violated the Uniformity Clause, as this "pretended classification" was "based solely on a difference in quantity of precisely the same kind of property [and was] necessarily unjust, arbitrary and illegal."); *Kelley*, 181 A. 602 (personal income tax which exempted two groups of individuals whose income fell below certain levels from paying any personal income tax, and required all other individuals with income above those levels to pay this tax, violated the Uniformity Clause due to the fact that the individuals obligated to pay the tax were

chosen by the legislature "merely for the reason that [the legislature determined] their incomes are sufficiently great to be taxed."); *Saulsbury*, 196 A.2d at 666 (because the Uniformity Clause requires strict uniformity within a class of individuals subject to a particular tax, such that all members of the class are obligated to pay the tax, "[p]art of the class may not be excused, regardless of the motive behind the action.").

Our recent decision in *Mt. Airy* reaffirmed the principles set forth in these cases. The taxing statute at issue therein imposed two different levels of municipal taxation on the yearly gross slot machine revenues of casinos operating outside of the city of Philadelphia: those with yearly gross revenues of $500 million or less paid a flat assessment of $10 million to the municipality in which they operated, while those with yearly gross revenues of more than $500 million paid the municipality 2% of its gross revenues. This resulted in casinos with less than $500 million in gross revenues paying a flat amount of $10 million, while casinos with gross revenues in excess of $500 million, because of the 2% tax rate, were required to pay more than $10 million. Reiterating the principles articulated in *Cope's Estate* and its progeny, our Court held that this taxing scheme violated the Uniformity Clause since it divided casinos into two groups of taxpayers based only upon their income, which resulted in one group with income above a certain level paying a higher tax rate than the other group with income below that level. We reemphasized that "the Uniformity Clause prohibits the General Assembly from imposing disparate tax rates upon income that exceeds a particular threshold." *Mt. Airy*, 154 A.3d at 276 (quoting *Kelley*, 181 A. at 602). Thus, our holding in *Mt. Airy* reaffirmed the central tenet of our Court's Uniformity Clause jurisprudence: a taxing statute which classifies similarly situated taxpayers solely on the basis of their income, and thereby places differing tax burdens on each class as a result, is forbidden.

*Turco Paint* and *Warner Brothers*, cited by the Department, do not compel a different result. In *Turco Paint*, the corporate net income tax statute at issue did not exempt portions of a corporation's net income from taxation, as the NLC does here; rather, the corporate net income tax statute imposed the same tax rate on all of a corporation's net income derived from its activities in Pennsylvania, which was determined for each corporation using the same three factors: the corporation's gross receipts from Pennsylvania, its Pennsylvania payroll, and the physical property it owned in Pennsylvania. *Turco Paint*, 184 A. at 41. Thus, although this taxation method produced some variance in the amount of a corporation's net income subject to taxation, due to the degree to which a corporation derived its income from Pennsylvania through its normal business activities, our Court did not find this variance constitutionally offensive, as it was not the product of purposeful legislative differentiation among groups of corporate taxpayers. *See id.* at 40 ("Where different rates are *legislatively imposed* on varying amounts or quantities of the same tax base, then you have a graded tax that lacks uniformity under our Constitution." (emphasis added)). By contrast, the NLC's disparate tax treatment of corporations based on the value of their net losses and their taxable income was the product of the General Assembly's deliberate choice of statutory language.

In *Warner Brothers*, the primary constitutional challenge concerned whether the General Assembly unlawfully delegated its power to impose income taxes to the federal government by using the federal income tax code's definition of a corporation's taxable income, which limited the amount of capital losses a corporation could take against its income to $2,000. We ruled that there was no such unlawful delegation. Although the appellant in that case had also raised a Uniformity Clause challenge, we cursorily

dismissed it with minimal analysis. 27 A.2d at 64. Indeed, we did not cite to or discuss *Cope's Estate* or any of its progeny.

We also reject the Department's argument that a different uniformity analysis is, as a general matter, appropriate when analyzing whether corporate taxes comport with the Uniformity Clause. The Department bases this contention on our Court's recognition in *Amidon* that the underlying purpose of corporate income tax deductions and personal income tax deductions is fundamentally different in nature, as corporate tax deductions are all directly related to the costs of the corporation incurred in performing its primary function of generating income and profit, whereas personal deductions cover a wide panoply of life activities, many of which are wholly unrelated to the production of income. *Amidon*, 279 A.2d at 63. While our Court has recognized critical differences between the corporate and personal tax codes, this recognition should not be interpreted as an endorsement of a wholly separate uniformity analysis for corporate and personal taxes. The Uniformity Clause, and our caselaw interpreting it, is equally applicable to both types of taxes. *See Saulsbury* (the language of the Uniformity Clause "must necessarily be construed to include . . . all other kinds of tax."); *American Stores Company v. Boardman*, 6 A.2d 826, 829 (Pa. 1939) (holding that the nature of the tax imposed "makes no difference in determining its uniformity under [the Uniformity Clause] of the Pennsylvania Constitution").

We, therefore, affirm the Commonwealth Court's decision that the NLC is unconstitutional as applied to Nextel.[20]

## B. Severability

---

[20] Nextel has not previously argued, and does not presently allege, that the NLC is facially unconstitutional. However, as Judge Pellegrini noted in his dissent below, the distinction in this case is arguably a meaningless one, given that our decision has precedential value in future challenges to similar statutes.

Our conclusion that the NLC is unconstitutional as applied to Nextel does not end the matter. Section 1925 of the SCA` requires that a severability analysis be undertaken whenever a statute has been invalidated as the result of an as-applied constitutional challenge. *See* 1 Pa.C.S. § 1925 (requiring courts, in the event that "any provision of any statute *or the application thereof to any person or circumstance* is held invalid" to determine if the void provision may be severed from the remaining valid portions of the statute (emphasis added)); *Commonwealth v. Qu'eed Batts*, 163 A.3d 410, 441 (Pa. 2017) (noting that a severability analysis is required if a provision of a statute is invalidated "as applied to any situation or person."). Consequently, since we have determined that the NLC, as written, is unconstitutional as applied to Nextel, due to its inclusion of the $3 million flat deduction, we must determine whether this portion of the NLC is severable from its remaining provisions.

The Department argues the NLC, like any other deduction or exemption, was established as a matter of legislative grace, and, thus, can be taken away at any time. The Department highlights the legislative history of the NLC, proffering that its purpose was to encourage companies such as Nextel to make investments in new enterprises and technologies by allowing them to deduct the initial heavy costs of those investments in years in which they were more profitable. However, the Department points out that this same legislative history shows that our legislature reacted to the deleterious effects on the state budget of the costs of this deduction and that, in response, the General Assembly first eliminated it entirely in 1991, and then, when it reinstated it, included limits or "caps" on the amount of the deduction, which have been in place ever since. According to the Department, the inclusion of such caps evidences the legislature's recognition that the state budget "could not sustain an unlimited deduction." Department Brief at 26. The Department contends that the Commonwealth Court

ignored the legislative intent to cap this deduction when it deemed the remedy for its finding that the NLC is unconstitutional to be the allowance of an unlimited net loss deduction for all corporations. The Department asserts that Judge Pellegrini's severability analysis in his concurring and dissenting opinion below, in which he would strike the $3 million flat deduction limit but leave intact the 12.5% deduction limit, which would then be equally available to all corporations, was an application of well settled legal principles governing severability, and the Department maintains that our Court should follow suit and adopt this particular remedy.

Nextel responds by contending that the only proper remedy, procedurally, is the removal of the net loss limitation for Nextel in 2007, placing it in the same position as the other 19,303 taxpayers which paid no taxes at all. The only alternative, in Nextel's view, would be to apply the 12.5% limitation to the other taxpayers who paid no tax, and to assess them for the amount of tax owed on the remainder of their taxable income after they take the 12.5% deduction; however, Nextel recognizes this is not possible since there is a three-year statute of limitations under which the Department may order an additional assessment, and this time period expired in 2011 — three years from the last possible date for a corporate taxpayer to file a return for tax year 2007.[21] Nextel contends that the only remedy for a Uniformity Clause violation is to grant the disfavored taxpayer relief by refunding all the taxes it paid under the unconstitutional statute; any lesser remedy it contends would have "a chilling effect" on taxpayers who wish to make such challenges. Nextel Brief at 34. In support, Nextel cites the cases relied upon by the Commonwealth Court majority, *Molycorp*, *Iowa-Des Moines National*

---

[21] According to the Department, it has not granted any waiver of this statute of limitations and is aware of no taxpayer which took the net loss deduction in 2007 that is still subject to assessment. Commonwealth's Response to Nextel's Interrogatories, 6/27/14, at 7 (R.R. at 128a).

*Bank,* and *Tredyffrin-Easttown School District,* reasoning that it overpaid its taxes because of the Uniformity Clause violation and, thus, like the litigants in those cases, is entitled to the same remedy — a full refund of the excess amount of taxes paid.

Nextel further argues that the General Assembly would not have adopted the NLC without the $3 million flat deduction since it would deny the 19,000 plus "small businesses an important deduction, resulting in a significant burden on them." *Id.* at 40. Hence, Nextel maintains that the General Assembly, given a choice between this outcome and having no cap on the deduction at all, would have chosen the latter option as that would be beneficial to small businesses. In support, Nextel notes that the legislature eliminated net loss deduction caps entirely from 1981 to 1990, and that, when it reimposed the cap, it has always allowed small corporations to deduct the entirety of their losses for each tax year.[22]

As a general matter, "[t]he public policy of this Commonwealth favors severability*." PPG Industries v. Commonwealth Board of Finance and Revenue*, 790 A.2d 261, 267 (Pa. 2001). Section 1925 of the SCA[23] furnishes the specific guiding

---

[22] *Amici,* the Council on State Taxation; the Institute for Professionals in Taxation; the Pennsylvania Business Council; the Greater Philadelphia Chamber of Commerce; the Greater Pittsburgh Chamber of Commerce; and the Pennsylvania Chamber of Business and Industry, have endorsed the Commonwealth Court's remedy of eliminating the cap on net loss deductions entirely for 2007, and thereby awarding Nextel a refund of all taxes it paid that year. *Amici* aver that it is preferable as a matter of policy to allow every corporate taxpayer to fully deduct all of their net losses in 2007, as such a remedy provides uniformity and would make Pennsylvania's business climate competitive with other states that impose no cap on this deduction. *Amici* contend that the alternative, striking the $3 million flat cap and leaving the 12.5% cap, would result in a broad tax increase for small businesses who have relied on the flat cap to eliminate their tax burden.

[23] This section provides:

**§ 1925. Constitutional construction of statutes**

The provisions of every statute shall be severable. If any provision of any statute or the application thereof to any person or circumstance is held invalid, the remainder of the

(continued…)

principles for our severability analysis. By its terms, Section 1925 creates a general presumption of severability for every statute, subject to two exceptions:

> (1) if the valid provisions are so essentially and inseparably connected with, and so depend upon, the void provision or application, that it cannot be presumed the General Assembly would have enacted the remaining valid provisions without the void one, or (2) if the remaining valid provisions, standing alone, are incomplete and incapable of being executed in accordance with the legislative intent.

*Robinson Township v. Commonwealth*, 147 A.3d 536, 559 (Pa. 2016). In determining whether either of these two exceptions are applicable to a particular statute, legislative intent is our Court's guiding consideration. *Id.*; *see also Saulsbury*, 196 A.2d at 667 ("In determining the severability of a statute . . . the legislative intent is of primary significance."). The "touchstone" for determining legislative intent in this regard is to answer the question of whether, after severing the unconstitutional provisions of a statute, "the legislature [would] have preferred what is left of its statute to no statute at all." *D.P. v. G.J.P.*, 146 A.3d 204, 216 (Pa. 2016).

Having determined that the NLC is unconstitutional as written because of its inclusion of the $3 million flat deduction, we perceive three available options: (1) sever the flat $3 million deduction from the remainder of the NLC; (2) sever both the $3 million

---

(…continued)

> statute, and the application of such provision to other persons or circumstances, shall not be affected thereby, unless the court finds that the valid provisions of the statute are so essentially and inseparably connected with, and so depend upon, the void provision or application, that it cannot be presumed the General Assembly would have enacted the remaining valid provisions without the void one; or unless the court finds that the remaining valid provisions, standing alone, are incomplete and are incapable of being executed in accordance with the legislative intent.

1 Pa.C.S. § 1925.

and 12.5% deduction caps and allow corporations to claim an unlimited net loss — the remedy chosen by the Commonwealth Court majority; or (3) strike down the entire NLC and, thus, disallow any net loss carryover. Our task, therefore, is to determine which of these actions would be most consistent with the legislature's intent in enacting the NLC. An examination of the legislative history of this provision is therefore necessary to ascertain that intent. *See, e.g., Robinson Township*, (legislative history indicated that the paramount intent of the General Assembly was to have PUC exercise enforcement authority over uniform statewide siting requirements for oil and gas wells in municipalities, and, absent those uniform requirements, the legislature would not have intended the PUC to possess such power). Our independent review of the legislative history of the various incarnations of the net loss carryover provision as it has existed in Pennsylvania law yields the conclusion that the General Assembly has, over time, employed different approaches to the allowance and scope of this deduction.

Prior to 1980, the Pennsylvania Revenue Code permitted no such deduction. Act 195 of 1980[24] introduced this deduction into the Revenue Code for the first time to, in the words of its proponents, assist new "high technology" businesses that were focused on the rapid development of new products, as well as to assist existing construction and farming enterprises which had been harmed by a recent recession. House Legislative Journal, at 2579, Remarks by Representative Pott (November 18, 1980). From its inception, and for the next 11 years, the amount of this deduction was uncapped. However, as a result of another recession which severely impacted the state's budgetary health, this deduction was wholly eliminated by Act 22 of 1991[25] as part of a broader effort to raise revenue. Senate Legislative Journal, at 2318, Remarks by

---

[24] Act of December 8, 1980, P.L. 1117, No. 195, § 2.
[25] Act of August 4, 1991, P.L. 97, No. 22, § 16.

Senator Mellow (June 14, 1994). Then the legislature reinstated the deduction three years later, *see* Act 48 of 1994;[26] the reinstated version, however, which was the product of significant compromise and negotiations, included a dollar cap of $500,000 on the deduction for all corporate taxpayers. *Id.* Thereafter, for the next twelve years, subsequent versions of this deduction enacted by the General Assembly steadily increased the amount of the deduction's cap, such that by tax year 2006 it stood at $2 million. *See* 72 P.S. § 7401 (effective 12/23/03-7/6/05) (repealed). In 2006, the NLC was enacted, which was the legislature's first utilization of this type of alternative cap structure which combined a flat dollar cap with a percentage cap. At present, for tax year 2015 and beyond, the cap stands at the greater of $5 million or 30% of a corporation's taxable income. *Id.* § 7401(3)4.(c)(1)(A)(VI).

This legislative history establishes that the General Assembly first granted the deduction without any cap at all, but abandoned this approach based on its determination that such an uncapped deduction had significant deleterious consequences for our Commonwealth's fiscal health. However, our legislature perceived that the deduction provided some public benefit by encouraging investment in the development of new technologies, as well as the acquisition of the physical infrastructure necessary to implement those technologies. Thus, the legislature reintroduced the deduction in 1994, but attempted to avert the excessive drain on the public fisc the prior unlimited deduction had caused by imposing a cap on the amount of this deduction which a corporation could take in a given tax year, and the legislature has steadfastly maintained this cap in various forms for the last 23 years. *See* Majority Caucus Brief at 2-4 (discussing evolving history of corporate net loss carryover deduction and highlighting that, since its reinstitution in 1994, it "has contained a dollar

---

[26] Act of June 16, 1994, P.L. 279, No. 48, § 10,

cap of some stripe"). Thus, the overall structure of the NLC reflects the legislature's intent to balance the twin policy objectives of encouraging investment (by allowing corporations to deduct some of the losses they sustain when making such investments against their future revenues), and ensuring that the Commonwealth's financial health is maintained (through the capping of the amount of this deduction).

Consequently, of the aforementioned three options available to us enumerated *supra*, we determine that the legislature's intent to have the NLC jointly further both of these policy objectives can best be effectuated by severing from the NLC the $3 million flat deduction. By striking this provision, all corporations for the tax year 2007 would be limited to taking a net loss carryover deduction of 12.5% of their taxable income for that year. Thus, each corporation will be entitled to avail itself of a net loss carryover deduction, as the legislature intended, but such deduction will be equally available to all corporations during that year, no matter what their taxable income. This fulfills the central tenet of the Uniformity Clause that the tax burden be borne equally by the class of taxpayers subject to paying it, inasmuch as it assures that all corporations will equally share in the obligation to pay corporate net income tax for tax year 2007.[27]

By contrast, we find the Commonwealth Court's chosen remedy, striking all caps in the NLC, contravenes the legislature's intent to limit this deduction. In order to avoid a repeat of the budgetary damage caused by the unlimited net loss deduction which was in effect from 1980-1991, the legislature has, since the reinstatement of this deduction in 1994, consistently required that it be capped. To remove all caps and

---

[27] The Revenue Department has indicated that it is not seeking the right to make additional assessments against any other taxpayer beyond the period of the statute of limitations, Department Reply Brief at 12 n.4, and our decision today does not confer such a right upon it.

allow unlimited net loss deductions would be clearly contrary to the wishes of the General Assembly.

Alternatively, if we were to strike the NLC in its entirety, it would eliminate *all* net loss deductions for corporations in tax year 2007, which, ironically, would leave Nextel owing more corporate taxes than it paid. This is also contrary to the General Assembly's intent to promote investment by allowing every corporation doing business in Pennsylvania an opportunity to benefit from this deduction.

Accordingly, we sever only the $3 million flat deduction from the NLC. As a result, Nextel is not entitled to have its 2007 tax assessment forgiven as, even with the offending provision of the NLC stricken, it is subject to the same tax liability for tax year 2007 as previously assessed by the Department. It is for this reason that Nextel is also not entitled to the relief granted the taxpayers in *Molycorp*, *Iowa-Des Moines National Bank,* and *Tredyffrin-Easttown School District.* Those cases did not involve a constitutional challenge to the structure of a taxing statute; rather, they all involved discriminatory application of an *otherwise valid* taxing statute to the parties by the taxing authority, and, thus, the only suitable remedy for such discrimination was to make whole the taxpayer who was overcharged through a refund of the overpaid taxes. Here, under the NLC, as severed, there was no overpayment of corporate income taxes by Nextel, as it owes exactly what the Revenue Department previously assessed.

Additionally, we reject Nextel's argument that failure to reward its challenge with a refund will somehow chill the bringing of future such actions to contest the constitutionality of taxing statutes. As our Court has noted previously, in dismissing a similar argument, "there is always an incentive, in the avoidance of liability for payment of taxes or fees in the future, to challenge the validity of a statute." *Oz Gas v. Warren Area School District*, 938 A.2d 275, 284 (Pa. 2007) (quoting *American Trucking*

*Association v. McNulty*, 596 A.2d 784, 790 (Pa. 1991)). Because Nextel is not entitled to a refund under the NLC, as severed, we reverse that portion of the Commonwealth Court order directing the Department to refund Nextel $3,938,220.

Order of the Commonwealth Court is affirmed in part and reversed in part. Jurisdiction is relinquished.

Chief Justice Saylor and Justices Donohue, Dougherty, Wecht and Mundy join the opinion.

Justice Baer files a concurring opinion in which Justices Donohue and Wecht join.