IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| General Motors Corporation, | : | |
| | : | |
| Petitioner | : | |
| | : | |
| v. | : No. 869 F.R. 2012 |
| | : Argued: September 10, 2019 |
| Commonwealth of Pennsylvania, | : | |
| | : | |
| Respondent | : | |

BEFORE:    HONORABLE P. KEVIN BROBSON, Judge
HONORABLE MICHAEL H. WOJCIK, Judge
HONORABLE BONNIE BRIGANCE LEADBETTER, Senior Judge


OPINION BY JUDGE WOJCIK                                         FILED:  November 21, 2019


General Motors Corporation (GM) petitions for review of the order of the Board of Finance and Revenue (F&R) sustaining a decision of the Commonwealth of Pennsylvania (Commonwealth) Department of Revenue's (Department) Board of Appeals that denied GM's petition for a refund of corporate net income tax in the amount of $738,760 for the tax year ended December 31, 2001 (2001 Tax Year).  At issue is the "net loss carryover" (NLC) provision contained in Section 401(3)4.(c)(1)(A)(I) of the Tax Reform Code of 1971 (Tax Code),[1] for the 2001 Tax Year, which imposed a $2,000,000 cap on the amount of

---

[1] Act of March 4, 1971, P.L. 6, *as amended*, 72 P.S. §7401(3)4.(c)(1)(A)(I).  This section provides:

(c)(1) The net loss deduction shall be the lesser of:

(A)(I) For taxable years beginning before January 1, 2007, two million dollars ($2,000,000); . . . .

**(Footnote continued on next page…)**

loss a corporation could carry over from prior years as a deduction against its 2001 taxable income. This statutory cap created a non-uniform classification based solely on whether the taxpayer's income exceeded $2,000,000; taxpayers whose income exceeded $2,000,000 paid the tax, while taxpayers whose income did not exceed $2,000,000 did not. The parties agree that the cap violates the Uniformity Clause of Article 8, Section 1 of the Pennsylvania Constitution. *See Nextel Communications of the Mid-Atlantic, Inc. v. Commonwealth*, 171 A.3d 682 (Pa. 2017), *cert. denied*, 138 S. Ct. 2635 (2018) (holding that a $3,000,000 flat-dollar cap of the NLC provision violated the Uniformity Clause of the Pennsylvania Constitution). However, they disagree regarding the appropriate remedy. To wit: in order to cure the constitutional infirmity, either the $2,000,000 flat-dollar deduction or the entire NLC provision must be severed from the Tax Code. Upon review, we conclude that only the flat-dollar deduction must be severed from the Tax Code, and we reverse F&R's order and remand to F&R for recalculation and the issuance of a refund.

## I. Background

This matter involves GM's petition for refund of Pennsylvania corporate net income tax in the amount of $738,760 for the 2001 Tax Year. According to the parties' Stipulation of Facts, GM is a Delaware corporation, engaged in the production and sale of motor vehicles throughout the United States,

---

**(continued…)**

72 P.S. §7401(3)4.(c)(1)(A)(I). In 2001, this provision was formerly codified at 72 P.S. §7401(3)4.(c)(1).

including Pennsylvania. GM carried into the 2001 Tax Year net losses, as defined under Section 401(3)4.(b) of the Tax Code, 72 P.S. §7401(3)4.(b), apportioned to Pennsylvania in the amount of $202,276,343, which had accumulated since the tax year ended December 31, 1995. For the 2001 Tax Year, GM's taxable income apportioned to Pennsylvania before accounting for any net loss deduction was $9,394,999. Although GM carried losses into the 2001 Tax Year ($202,000,000) that vastly exceeded its 2001 income ($9,300,000), GM took a net loss deduction of only $2,000,000, which was the statutory cap on net loss deductions. After accounting for the net loss deduction, GM reported taxable income apportioned to Pennsylvania of $7,394,999, which resulted in a corporate net income tax liability of $738,760, which GM paid in full. The Department accepted GM's Tax Report as filed and did not issue an assessment. Stipulation of Facts (S.F.), 12/14/18, Nos. 2-10.

In February 2012, GM filed a petition for refund of Pennsylvania corporate net income tax paid for the 2001 Tax Year with the Board of Appeals claiming entitlement to a full refund based on its contention that the flat-dollar net loss cap violated the Uniformity Clause of the Pennsylvania Constitution. GM argued that, had the deduction not been limited to $2,000,000, it could have deducted net losses equal to its taxable income, thereby reducing its taxable income from $7,394,999 to $0, like the favored taxpayers. The Board of Appeals denied the petition. GM timely appealed to F&R raising the same issues.

F&R recited the applicable provisions of the Tax Code: "A net loss for a taxable year is the negative amount for said taxable year determined under subclause 1 or, if applicable, subclause 2. Negative amounts under subclause 1 shall be allocated and apportioned in the same manner as positive amounts."

3

Section 401(3)4.(b) of the Tax Code, 72 P.S. §7401(3)4.(b). Under subclause 1, "The net loss deduction shall be the lesser of: (A)(I) For taxable years beginning before January 1, 2007, two million dollars ($2,000,000)." 72 P.S. §7401(3)4.(c)(1).

F&R denied GM's request for relief because the Tax Code set the limit on net loss deductions for the 2001 Tax Year at $2,000,000. As to GM's challenge to the validity and/or constitutionality of the statutory cap, F&R stated that, as an administrative tribunal, it can only apply the current state of Pennsylvania law and cannot pass upon the validity or constitutionality of that law. *See Parsowith v. Department of Revenue*, 723 A.2d 659, 662 (Pa. 1999) (F&R is not a competent tribunal to pass upon a challenge of a statute's validity or constitutionality); *Philadelphia Life Insurance Co. v. Commonwealth*, 190 A.2d 111, 116 (Pa. 1963) (same). Thus, on November 6, 2012,[2] F&R affirmed the decision of the Board of Appeals and denied GM's petition for review of refund. GM's timely-filed petition for review to this Court followed.[3, 4]

---

[2] F&R reached its decision prior to the Supreme Court's *Nextel* decision.

[3] This Court's review in this matter is "de novo in nature, with no record being certified by [F&R]." Pa. R.A.P. 1571; *Andrews v. Commonwealth*, 196 A.3d 1090, 1096 (Pa. Cmwlth. 2018). "Although the Court hears these cases under its appellate jurisdiction, the Court functions essentially as a trial court." *Andrews,* 196 A.3d at 1096 (citation omitted). Our decision is based on either a record created before this Court or, as in this case, stipulated facts. *Graham Packaging Co., LP v. Commonwealth*, 882 A.2d 1076, 1077 (Pa. Cmwlth. 2005).

[4] Because the issue involved in this case was similar to the issue involved in *Nextel*, which was then pending before this Court, the parties asked the Court to hold the matter in abeyance pending disposition of *Nextel*.

4

## II. Issues

In this appeal, GM argues that, as a matter of statutory construction, *Nextel* requires that the $2,000,000 cap be stricken from the statute, leaving no cap on the net loss deduction for the 2001 Tax Year, not the entire NLC provision. Further, considering that some taxpayers have actually paid tax for 2001, while others have not, GM contends the Due Process and Equal Protection Clauses of the United States Constitution and the Remedies Clause of the Pennsylvania Constitution require an actual (as opposed to hypothetical) equalization of the relative tax positions of the taxpayers for 2001. *See* U.S. Const. amend. XIV, §1; Pa. Const. art. VIII, §1. We must also determine whether the remedy in this case should apply retroactively or prospectively.

## III. Discussion
### A. *Nextel* & the Uniformity Clause
#### 1. Contentions

GM asserts that, in the 2001 Tax Year, GM and 133 corporations had their loss deductions limited because their income exceeded $2,000,000; if the deductions had not been limited, those corporations could have applied their carryover net losses to reduce their taxable income to zero. S.F. No. 15. By contrast, over 15,000 other corporate taxpayers did not have their loss deductions limited because their income fell below the $2,000,000 threshold; they were able to deduct their total losses and reduce their taxable income to zero; and they paid no tax. S.F. No. 14. GM maintains that the Uniformity Clause prohibits classification by income and has done so for over 100 years. While GM's appeal was pending, the Supreme Court held in *Nextel* that a flat-dollar limitation on the loss deduction

5

for the 2007 tax year violated the Uniformity Clause because it created two classes of "taxpayers solely on the basis of their income." 171 A.3d at 699-700. The Court severed the unconstitutional flat-dollar limitation from the statute. *Id.* In accordance with *Nextel*, GM seeks the same relief here.

The Commonwealth responds that legislative intent is paramount in this case of statutory severance. Whether the severance is limited to the flat-dollar deduction or extended to the entire NLC provision requires ascertaining the legislature's intent in enacting the NLC provision. According to the Commonwealth, the legislative history, as analyzed by the Supreme Court in *Nextel*, confirms that the General Assembly never intended an unlimited NLC deduction, which would be the result if the flat-dollar deduction is severed. Rather, the primary legislative intent is to protect the Commonwealth's fiscal health, which is served by severing the entire NLC provision. If the entire NLC provision is severed, GM will not have overpaid its tax and will not be entitled to a refund.

### 2. Analysis

The Uniformity Clause provides:

> All taxes shall be uniform, upon the same class of subjects, within the territorial limits of the authority levying the tax, and shall be levied and collected under general laws.

Pa. Const. art. VIII, §1. The test of uniformity is whether there is a reasonable distinction and difference between the classes of taxpayers sufficient to justify different tax treatment. *Allegheny County v. Monzo*, 500 A.2d 1096, 1106 (Pa. 1985).

6

In *Nextel*, the Supreme Court examined whether the NLC provision for the 2007 tax year, which restricted the amount of loss a corporation could carry over from prior years as a deduction against its 2007 taxable income to whichever is greater: 12.5% of the corporation's 2007 taxable income or $3,000,000, violated the Uniformity Clause. *See* 72 P.S. §7401(3)4.(c)(1)(A)(II).

The Court opined that the Uniformity Clause prohibits classifying taxpayers, including corporations, based on the amount of their income. *Nextel*. "[C]lassifications based solely upon the quantity or value of the property being taxed are arbitrary and unreasonable, and, hence, forbidden." *Nextel*, 171 A.3d at 696.

In determining whether the NLC provision violated the Uniformity Clause, the Court did not "look at its language in a vacuum"; rather, it examined how the statute "functions when applied to establish a corporation's net income tax liability." *Nextel*, 171 A.3d at 698. The Court examined the long history of the NLC deduction and the legislative intent behind the deduction.

The General Assembly first introduced the deduction in 1980 to spur business investment in Pennsylvania. *Nextel*, 171 A.3d at 703. However, a recession that "severely impacted the state's budgetary health" led to the suspension of the deduction from 1991 through 1994. *Id.* at 704. In 1994, the General Assembly reinstated the deduction, which included a flat-dollar cap for the first time. The Court determined that "the overall structure of the NLC reflects the legislature's intent to balance the twin policy objectives of encouraging investment (by allowing corporations to deduct some of the losses they sustain when making such investments against their future revenues), and ensuring that the

7

Commonwealth's financial health is maintained (through the capping of the amount of this deduction)." *Id.* at 704.

> The Court then examined the NLC provision for the 2007 tax year:
>
> > Under its terms, the NLC allows any corporation with taxable income of $3 million or less in 2007 to fully deduct all net losses carried over from prior years up to the entire amount of its taxable income. As a result, such corporations pay no corporate net income taxes, given that the statutory tax rate of 9.9% is ultimately applied only to a corporation's net income. [Section 402 of the Tax Code,] 72 P.S. § 7402(b). Thus, the NLC gives corporations with $3 million or less in taxable income, and carryover losses equaling or exceeding their taxable income, a de facto total exemption from paying the corporate net income tax. By contrast, corporations with taxable income over $3 million are not permitted to exempt their entire income from taxes, even if, like [the taxpayer], they have sufficient net losses from prior years to offset it. Instead, such corporations are limited in the amount of prior net losses they can claim to the greater of 12.5% of their taxable income or $3 million, thereby requiring them to pay the corporate net income tax of 9.9% on the remaining portion of their taxable income.

*Nextel*, 171 A.3d at 698-99. The Court determined that "the NLC, by allowing corporations to take a flat $3 million [NLC] deduction against their taxable income, has effectively created two classes of taxpayers among corporations which have [NLC] deductions equal to or exceeding their taxable income." *Id.* at 699. Such a classification creates an exemption from taxation solely on the basis of income, which runs afoul of the Uniformity Clause. *Id.* Thus, the Court concluded that the NLC provision was unconstitutional as applied to the taxpayer based on its inclusion of the $3,000,000 flat deduction. *Id.* at 701.

8

The Court then conducted a severability analysis. *Nextel*, 171 A.3d at 701; *see* Section 1925 of the Statutory Construction Act of 1972 (Statutory Construction Act), 1 Pa. C.S. §1925 (requiring courts, in the event that "any provision of any statute or the application thereof to any person or circumstance is held invalid" to determine if the void provision may be severed from the remaining valid portions of the statute). Section 1925 creates a general presumption of severability for every statute, subject to two exceptions:

> (1) if the valid provisions are so essentially and inseparably connected with, and so depend upon, the void provision or application, that it cannot be presumed the General Assembly would have enacted the remaining valid provisions without the void one, or (2) if the remaining valid provisions, standing alone, are incomplete and incapable of being executed in accordance with the legislative intent.

*Nextel*, 171 A.3d at 703 (citation omitted).

"In determining whether either of these two exceptions are applicable to a particular statute, legislative intent is our Court's guiding consideration." *Id.; see also Saulsbury v. Bethlehem Steel Co.*, 196 A.2d 664, 666 (Pa. 1964) ("In determining the severability of a statute . . . the legislative intent is of primary significance."). "The 'touchstone' for determining legislative intent in this regard is to answer the question of whether, after severing the unconstitutional provisions of a statute, 'the legislature [would] have preferred what is left of its statute to no statute at all.'" *Nextel*, 171 A.3d at 703 (quoting *D.P. v. G.J.P.*, 146 A.3d 204, 216 (Pa. 2016)).

The Supreme Court then considered the following three options:

> (1) sever the flat $3 million deduction from the remainder of the NLC; (2) sever both the $3 million and 12.5% deduction caps and allow corporations to claim an

9

unlimited net loss—the remedy chosen by the Commonwealth Court majority; or (3) strike down the entire NLC and, thus, disallow any [NLC].

*Id.* at 703. The Court determined that the first option of severing the $3,000,000 flat deduction from the remainder of the statute while preserving the percentage cap[5] was the most consistent with legislative intent because it furthered the legislature's twin policy objectives. *Id.* at 704. The Court explained:

By striking this provision, all corporations for the tax year 2007 would be limited to taking a [NLC] deduction of 12.5% of their taxable income for that year. Thus, each corporation will be entitled to avail itself of a [NLC] deduction, as the legislature intended, but such deduction will be equally available to all corporations during that year, no matter what their taxable income. This fulfills the central tenet of the Uniformity Clause that the tax burden be borne equally by the class of taxpayers subject to paying it, inasmuch as it assures that all corporations will equally share in the obligation to pay corporate net income tax for tax year 2007.

*Id.* at 704-05. In the process, it explained that striking all caps in the NLC provision (option (2)) contravened the legislature's intent to limit this deduction to protect the Commonwealth's fiscal health by allowing unlimited net loss deductions. *Id.* at 705. Alternatively, the Court reasoned that striking the entire NLC provision (option (3)) would leave the taxpayer owing more corporate taxes than it paid and contravened the legislature's "intent to promote investment by allowing every corporation doing business in Pennsylvania an opportunity to benefit from this deduction." *Id.* at 705.

---

[5] For the tax years between 2007 and 2017, the NLC deduction included both a flat-dollar cap *and* a percentage cap. *See* 72 P.S. §7401(3)4.(c)(1)(A)(II)-(VII). For the tax years between 1994 and 2006, the NLC deduction included only a flat-dollar cap. *See* 72 P.S. §7401(3)4.(c)(1)(A)(I).

In this case, we are dealing with the 2001 Tax Year, in which the NLC's dollar cap stood at $2,000,000. This limitation is the operational equivalent of the cap the Supreme Court severed in *Nextel*. The parties agree the $2,000,000 flat deduction runs afoul of the Uniformity Clause based on *Nextel*. Consequently, we must engage in a severability analysis.

However, unlike the NLC provision at issue in *Nextel*, the NLC provision here does not contain a percentage cap option. As a result, there are only two severability options available:

> (1) sever the flat $2,000,000 deduction from the remainder of the NLC and allow corporations to claim an unlimited net loss; or
>
> (2) strike down the entire NLC and, thus, disallow any [NLC].

The Supreme Court determined neither one of these options satisfied *both* of the General Assembly's policy goals of promoting business investment while maintaining the Commonwealth's fiscal health. *Nextel*, 171 A.3d at 704-05. Unfortunately, the Supreme Court did not determine which of these divergent goals would better serve the General Assembly's intent. *See id.*

While *Nextel* was pending before the Supreme Court, this Court faced a similar predicament in *RB Alden Corp. v. Commonwealth*, 142 A.3d 169 (Pa. Cmwlth. 2016) (*Alden I*).[6] In *Alden I*, as here, the NLC provision for the 2006 tax year contained a $2,000,000 flat cap, but no percentage cap. *Alden I*, 142 A.3d at 185. Upon determining that the $2,000,000 cap was unconstitutional, we eliminated the cap from the NLC provision and remanded the matter to F&R to

---

[6] *Alden I* also involved application of the tax benefit rule, which this Court declined to adopt. 142 A.3d at 183-84. The tax benefit rule is not an issue here.

11

calculate the taxpayer's corporate net income tax without a cap. *Id.* at 186. This enabled the taxpayer to claim an unlimited NLC deduction for the 2006 tax year.[7] *See id.* Having decided the matter without the benefit of the Supreme Court's analysis in *Nextel*, this Court did not examine legislative intent when fashioning a remedy to cure the constitutional infirmity. *See id.* On appeal, the Supreme Court, by per curiam order, vacated this Court's final order and remanded the matter "for reconsideration in light of" *Nextel*. *RB Alden Corp. v. Commonwealth*, 194 A.3d 125 (Pa. 2018) (*Alden III*).[8]

*Nextel* directs that legislative intent is paramount in a case of statutory severance. 171 A.3d at 703. Given the divergent goals presented here, and the absence of a third option that would satisfy both goals that was present in *Nextel*, we must determine the General Assembly's paramount intention. *Commonwealth v. Neiman*, 84 A.3d 603, 614 (Pa. 2013). We start by examining the "'main' purpose" for the legislation. *Neiman*, 84 A.3d at 614.

The General Assembly enacted the NLC provision to promote business development in Pennsylvania. *Nextel*, 171 A.3d at 705. In the words of its proponents, the purpose of the NLC provision was to: "assist new 'high technology' businesses that were focused on the rapid development of new products, as well as to assist existing construction and farming enterprises which

---

[7] The Commonwealth and the taxpayer both filed timely exceptions. This Court overruled the Commonwealth's exceptions and dismissed the taxpayer's exceptions as moot. *See RB Alden Corp. v. Commonwealth*, 169 A.3d 727 (Pa. Cmwlth. 2017) (*en banc*) (*Alden II*).

[8] Because the issue on remand in *RB Alden Corp. v. Commonwealth* (Pa. Cmwlth., No. 73 F.R. 2011, filed November 21, 2019) (*Alden IV*), is virtually identical to the issue presented here, these matters were argued seriately before this Court on September 10, 2019.

12

had been harmed by a recent recession." *Id.* at 703-04 (quoting House Legislative Journal, at 2579, Remarks by Representative Pott (November 18, 1980)).

As the Supreme Court in *Nextel* recognized, the NLC provision has been around in one form or another since 1981. *Id.* at 704. For the first ten years, the NLC deduction was unlimited. *Id.* During a recession, the General Assembly suspended the NLC provision for four years and, since 1994, has steadfastly maintained a cap in various forms ever since to maintain the state's fiscal health. *Id.*

The legislative enactments to suspend or limit the NLC deduction clearly demonstrate the General Assembly's "intent to limit this deduction" to promote the Commonwealth's fiscal health. *Nextel*, 171 A.3d at 705. But, is fiscal health the *primary* objective of the NLC provision?

Recently, in *Safe Auto Insurance Company v. Oriental-Guillermo*, 214 A.3d 1257, 1268 (Pa. 2019), our Supreme Court examined "divergent policy concerns" in the context of determining the enforceability of an unlisted resident driver exclusion (URDE) in a personal automobile insurance policy. At issue was whether the URDE contravened the Motor Vehicle Financial Responsibility Law (MVFRL)[9] and its underlying "competing public policy concerns of remedial coverage and cost containment." *Id.* at 1268. Although cost containment is clearly one of the policy concerns to be considered, the Court determined it was not "the *dominant* public policy underlying the MVFRL." *Id.* (emphasis added). Rather, the dominant policy was the remedial purpose of the MVFRL, which was retained from the prior regulatory scheme. *Id.*

---

[9] 75 Pa. C.S. §§1701-1799.7.

13

The same reasoning applies here. Although fiscal health is clearly *one* of the policy concerns to be considered, and an important one at that, it is *not the dominant* public policy underlying the NLC provision. In other words, it is not the "main purpose" for the legislation. *See Neiman*. The main purpose of the NLC provision, its *raison d'être* (reason for being), is to promote business investment in the Commonwealth. The flat-dollar limitation serves as a public purse safeguard that is ancillary to the overarching purpose of business promotion.

Furthermore, the General Assembly has demonstrated an intent to keep the NLC provision since its enactment, even during periods of economic recession. Although the General Assembly suspended the deduction or placed a cap on it, it never actually repealed the NLC provision. *Cf. PPG Industries, Inc. v. Board of Finance and Revenue*, 790 A.2d 261, 269 (Pa. 2001) (in a case severing the unconstitutional manufacturing exemption from the capital stock/franchise tax, the Supreme Court observed that the General Assembly had first added the exemption 45 years after the original statute was passed and then repealed and reenacted it twice).

Finally, Section 1925 of the Statutory Construction Act instructs:

> The provisions of every statute shall be severable. If any provision of any statute or the application thereof to any person or circumstance is held invalid, the remainder of the statute, and the application of such provision to other persons or circumstances, shall not be affected thereby, unless the court finds that the valid provisions of the statute are so essentially and inseparably connected with, and so depend upon, the void provision or application, that it cannot be presumed the General Assembly would have enacted the remaining valid provisions without the void one; or unless the court finds that the remaining valid provisions, standing alone, are incomplete and are

14

> incapable of being executed in accordance with the legislative intent.

1 Pa. C.S. §1925. Indeed, "if the provisions are distinct and not so interwoven as to be inseparable, . . . the courts should sustain the valid portions." *Saulsbury*, 196 A.2d at 666. "[P]ublic policy . . . favors severability." *Nextel*, 171 A.3d at 702 (quoting *PPG Industries*, 790 A.2d at 267).

In this regard, the flat-dollar limitation is fully capable of separation from the NLC provision. Only the flat-dollar limitation fails the uniformity test, not the entire NLC provision. *See Nextel*, 171 A.3d at 703. The valid NLC provisions are not "inseparably connected with" or "depend[ent] upon" the void flat-dollar provision. *See id.* The valid NLC provisions, standing alone, are complete and capable of execution. *See Nextel*, 171 A.3d at 703. As the history of the NLC provision shows, this legislation has previously existed without a cap. By excising only the flat-dollar limitation from the statute, the NLC provision serves the General Assembly's *primary* intent of promoting business investment in the Commonwealth.

Considering the intent and history of the NLC provision as well as a public policy that favors severability, we believe that the General Assembly would prefer "what is left of its statute to no statute at all." *Nextel*, 171 A.3d at 703. For these reasons, we find that the General Assembly's intent is better served by severing the offending portion (the flat-dollar $2,000,000 cap) as opposed to striking the entire NLC provision.

Notwithstanding, even if this Court was to determine that the General Assembly would favor striking the entire NLC provision, the following constitutional analysis leads us to the same conclusion that severing the flat-dollar

15

provision is the only remedy that cures the constitutional infirmity in a meaningful and adequate way.

## B. Due Process, Equal Protection and the Remedies Clause

### 1. Contentions

GM maintains that severing the flat-dollar limitation is the only remedy that actually satisfies due process, equal protection and the Remedies Clause. Conversely, striking the entire NLC provision produces a mere "hypothetical" equalization of the relative tax position of taxpayers in 2001, but in actuality leaves intact the illegal non-uniform tax positions of the two classes based solely on income: (1) GM and 133 other corporations that paid tax because their net income exceeded the $2,000,000 cap (disfavored taxpayers); and (2) 15,000 others taxpayers that paid no tax because their net income did not (favored taxpayers). Because the statute of limitations has closed, the Department cannot go back and assess the favored taxpayers to disallow the net loss deductions that they have already taken. GM maintains that due process, equal protection and the Remedies Clause require "meaningful backward-looking relief" so that the actual relative position of GM (and the other disfavored taxpayers) is "equival[ent] to the position actually occupied by . . . [the] favored taxpayers." *McKesson Corp. v. Division of Alcoholic Beverages and Tobacco, Department of Business Regulation of Florida*, 496 U.S. 18, 31, 42 (1990). These constitutional issues were not addressed by the Supreme Court in *Nextel*. According to GM, the only way to actually equalize the tax positions between disfavored and favored taxpayers in this case is to sever the cap and issue GM a full refund of all taxes paid under the

16

unconstitutional statute. Such relief would actually put GM on par with the favored taxpayers that paid no tax.

The Commonwealth counters that prospective relief in this case is not foreclosed by due process, equal protection or the Remedies Clause. It claims that GM's reliance on *McKesson* and progeny is misplaced. *McKesson* involved a state tax law that was held invalid under the Commerce Clause (U.S. Const. art. I, §8). The Commerce Clause is not involved here, nor is there any question of federal law in this case. Contrary to GM's assertions, the due process, equal protection and *McKesson* arguments were fully briefed, argued and given due consideration by the Supreme Court in *Nextel* and should not be reconsidered in this appeal.[10] Although GM's Remedies Clause argument is new, this constitutional provision is currently being satisfied as GM is pursuing an equalization remedy through the open courts. However, that remedy does not necessarily entitle GM to a refund.

## 2. Analysis

### a. Due Process

The Due Process Clause of the Fourteenth Amendment to the U.S. Constitution provides that no state may "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, §1. The maxim of "where there is a legal right, there is also a legal remedy," is the "essence of

---

[10] The attorneys that represent GM in this matter also represented the taxpayer in *Nextel*. GM concedes that the taxpayer in *Nextel* raised these constitutional arguments in its supplemental appellee's brief. Petitioner's Reply Brief at 14. However, the Supreme Court did not decide or address GM's due process and equal protection arguments or cite *McKesson* in its decision. *See Nextel*. In Pennsylvania, only a question that has been "conclusively decided" is precedential. *See William Penn School District v. Pennsylvania Department of Education*, 170 A.3d 414, 462 (Pa. 2017).

civil liberty." *Marbury v. Madison*, 5 U.S. 137, 163 (1803). Every injury requires "proper redress." *Id.* at 147.

In *McKesson*, the U.S. Supreme Court examined the requirements of due process in a tax discrimination case. There, the state court properly struck down a liquor tax as unconstitutional because it discriminated against interstate commerce by giving preference for liquor made from state-grown crops. 496 U.S. at 22. Despite declaring the law unconstitutional, the state court applied prospective relief and declined to provide a refund for any other form of post-payment relief. *Id.*

On appeal, the U.S. Supreme Court, in a unanimous decision, reversed the state court's failure to provide the taxpayer meaningful relief for its payment of an unlawful tax. *McKesson*, 496 U.S. at 52. The Court opined that:

> The question before us is whether prospective relief, by itself, exhausts the requirements of federal law. The answer is no: If a State places a taxpayer under duress promptly to pay a tax when due and relegates him to a postpayment refund action in which he can challenge the tax's legality, *the Due Process Clause of the Fourteenth Amendment obligates the State to provide meaningful backward-looking relief to rectify any unconstitutional deprivation.*

*Id.* at 31 (footnotes omitted).

The U.S. Supreme Court ruled that "a State found to have imposed an impermissibly discriminatory tax retains flexibility in responding to this determination" so long as that remedy is meaningful. *Id.* at 39-40. Where a state "offers a meaningful opportunity for taxpayers to withhold contested tax assessments and to challenge their validity in a predeprivation hearing," the "availability of a predeprivation hearing constitutes a procedural safeguard . . .

sufficient by itself to satisfy the Due Process Clause." *Id.* at 38 n.21. If no such predeprivation remedy exists, "the Due Process Clause of the Fourteenth Amendment obligates the State to provide meaningful backward-looking relief to rectify any unconstitutional deprivation." *Id.* at 31 (footnote omitted). In providing such relief, a state may award a full tax refund to the taxpayer or some other order that "create[s] in hindsight a nondiscriminatory scheme." *Id.* at 40.

The U.S. Supreme Court explained that due process is satisfied only if the "position" that the taxpayer occupies at the end of the day is "equivalen[t] to the position actually occupied by the [taxpayer's] favored competitors." *McKesson*, 496 U.S. at 42. It is insufficient to merely "place [a taxpayer] in the same tax position that [the taxpayer] would have been placed by . . . a hypothetical" reformation of a discriminatory statute. *Id.* at 41.

As the Pennsylvania Supreme Court explained:

> The [*McKesson*] Court did not bind the state's hands in choosing what type of backward[-]looking remedy it would employ. Rather, the Court held that State could cure the invalidity by: (1) refunding the difference between the tax paid and the tax that would have been assessed had the taxpayer been granted the unlawful exemption; (2) assessing and collecting back taxes, to the extent consistent with other constitutional restrictions, from those who benefited from the unlawful exemption during the contested tax period, calibrating the retroactive assessment to create in hindsight a nondiscriminatory scheme; or (3) applying a combination of a partial refund and a partial retroactive assessment, so long as the resultant tax actually assessed during the contested tax period reflects a scheme that does not discriminate against interstate commerce.

19

*Annenberg v. Commonwealth*, 757 A.2d 338, 349-50 (Pa. 2000), *cert. denied sub nom. Annenberg v. Board of Commissioners of Montgomery County*, 531 U.S. 959, (2000) (footnote omitted).

The Commonwealth argues that *McKesson* does not apply here because the present case does not involve a violation of the Commerce Clause or a question of federal law. However, the Commonwealth cites no authority and offers no persuasive reason to apply the analysis in *McKesson* so narrowly.

To the contrary, the Courts of this Commonwealth have previously recognized that *McKesson* dictates that some retroactive remedy is necessary to remedy an unconstitutional tax statute, whatever the root of the constitutional infirmity may be. *See PPG Industries*, 790 A.2d at 270 (*McKesson* "dictates that some retroactive remedy" is necessary to rectify "prior unconstitutional discrimination");[11] *Automobile Trade Association of Greater Philadelphia v. City of Philadelphia*, 596 A.2d 794 (Pa. 1991) (recognizing that *McKesson*'s due process principles are relevant to vindicate a taxpayer's rights under the Uniformity Clause, but remanding for a determination as to whether the challenged mercantile license tax was unconstitutional); *Z & R Cab, LLC v. Philadelphia Parking Authority*, 187 A.3d 1025 (Pa. Cmwlth. 2018) (applying *McKesson*'s analysis in determining that the taxicab licensees could be entitled to recover a portion of their fees and assessments paid under an unconstitutional state statute that violated their due process rights); *Lebanon Valley Farmers Bank v. Commonwealth*, 27 A.3d 288 (Pa. Cmwlth. 2011), *rev'd on other grounds*, 83 A.3d 107 (Pa. 2013) (upon determining that a share tax was unconstitutional because it

---

[11] The challenged tax in *PPG Industries* discriminated against interstate commerce and violated the Commerce Clause.

20

violated the Uniformity Clause, this Court relied on *McKesson* in holding that meaningful retrospective relief was warranted); *Dunn v. Board of Property Assessment, Appeals and Review of Allegheny County*, 877 A.2d 504, 516-17 (Pa. Cmwlth. 2005), *aff'd*, 936 A.2d 487 (Pa. 2007) (determining that the statutory scheme under which aggrieved taxpayers could obtain a refund of purportedly unlawful property taxes satisfied the Due Process Clause as contemplated by *McKesson*); *Fidelity Bank, N.A. v. Commonwealth By and Through Department of Revenue*, 645 A.2d 452, 456 (Pa. Cmwlth. 1994) (stating that "[i]n general, under *McKe[s]son*, the relief given must be equivalent to the monetary interest lost by the banks [(that paid improper single excise taxes)] because of the requirement to pay the . . . taxes prior to challenging the tax scheme" and holding that relief in the form of credits, as opposed to cash refunds, "fit[] within the concept of 'meaningful backward-looking relief' required under the constitution").

Here, Pennsylvania relegates taxpayers to postpayment refund actions in which they may challenge the accuracy and legal validity of their tax obligation. Section 3003.2(a)(1) of the Tax Code[12] provides every corporation subject to the corporate net income tax "shall make payments of estimated corporate net income tax." Sections 3003.5 and 3003.6 of the Tax Code[13] set forth the procedure for seeking a postpayment refund. Pennsylvania penalizes taxpayers for failing to remit taxes in a timely fashion. *See* Section 3003.7 of the Tax Code[14] (a person that fails to make a payment is subject to penalties and interest). Therefore,

---

[12] Added by the Act of July 1, 1985, P.L. 29, *as amended*, 72 P.S. §10003.2(a)(1).

[13] Added by the Act of June 16, 1994, P.L. 279, *as amended*, 72 P.S. §§10003.5, 10003.6.

[14] Added by the Act of June 16, 1994, P.L. 279, 72 P.S. §10003.7.
**(Footnote continued on next page…)**

21

*McKesson* requires us to consider the due process requirement of providing taxpayers with a meaningful retrospective remedy.

Applying *McKesson* to the matter at hand, we reexamine the available remedies: severing the entire NLC provision or severing the cap. Severing the entire NLC provision would theoretically equalize tax positions by eliminating any deduction and require all taxpayers to pay tax by removing the deduction completely. Under this approach, GM correctly paid the tax. Hypothetically, the nonpaying taxpayers would now owe tax. However, in actuality, because the three-year statute of limitations has passed, those taxpayers that previously did not owe or pay the tax would not be subject to assessment for the 2001 Tax Year. *See* Section 407.3(a) of the Tax Code[15] ("Tax may be assessed within three years after the date the report is filed."). Consequently, the actual disparity of the tax positions between the classes would remain: those that paid tax (unfavored) and those that did not (favored) for the 2001 Tax Year. Under *McKesson*, restoring GM to a "'hypothetical' nondiscriminatory scheme does not in hindsight avoid the unlawful deprivation." 496 U.S. at 43. It still, in fact, treats GM worse than the favored taxpayers that paid no tax, thereby perpetuating the Uniformity Clause violation during the contested tax period. *See id.*

Conversely, if the $2,000,000 cap is severed from the NLC provision, GM would be entitled to a full refund of the taxes paid for the 2001 Tax Year. This would place GM in the same tax position as the favored taxpayers that paid no

---

**(continued…)**

[15] Added by the Act of October 18, 2006, P.L. 1149, 72 P.S. §7407.3(a).

22

tax for the 2001 Tax Year. Under *McKesson,* severance of the flat-dollar deduction is the only way to satisfy due process and provide GM a meaningful remedy for unlawful tax collection. Any lesser remedy would have a chilling effect on taxpayers that wish to make such challenges.

### b. Equal Protection

Next, the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution provides that no state may "deny to any person . . . the equal protection of the laws." U.S. Const. amend. XIV, §1. "The Equal Protection Clause applies only to taxation which in fact bears unequally on persons or property of the same class." *Allegheny Pittsburgh Coal Co. v. County Commission of Webster County, West Virginia*, 488 U.S. 336, 343 (1989) (citation and internal quotation omitted). "The [E]qual [P]rotection [C]lause . . . protects the individual from state action which selects him out for discriminatory treatment by subjecting him to taxes not imposed on others of the same class." *Id.* at 345.

A state law that does not target a protected class is subject to rational basis review. *Armour v. City of Indianapolis*, *Indiana*, 566 U.S. 673, 680 (2012). This means that "if there is a rational relationship between the disparity of treatment and some legitimate governmental purpose," the law will meet the standard. *Id.* In creating classifications and distinctions in tax statutes, "[l]egislatures have especially broad latitude." *Id.* (citation omitted); *accord Allegheny Pittsburgh Coal*, 488 U.S. at 344. "If the selection or classification is neither capricious nor arbitrary, and rests upon some reasonable consideration of difference or policy, there is no denial of the equal protection of the law." *Allegheny Pittsburgh Coal*, 488 U.S. at 344.

23

Although the rational basis standard is relatively lax, when a tax classification violates a state's own law, it cannot meet the standard. *See Allegheny Pittsburgh Coal*, 488 U.S. at 345. For example, in *Allegheny Pittsburgh Coal*, the U.S. Supreme Court examined a local taxing scheme, which valued some properties based on recent purchase prices. The Supreme Court determined that the tax scheme ran afoul of the state's (West Virginia) constitution, which provided that all property shall be taxed in proportion to its value. The relative undervaluation of comparable property in the county denied the taxpayers of equal protection of the law. 488 U.S. at 346. As for the remedy, the Court ruled that "[a] taxpayer in this situation may not be remitted by the State to the remedy of seeking to have the assessments of the undervalued property raised." *Id.* "The [Equal Protection Clause] is not satisfied if a State does not itself remove the discrimination, but imposes on him against whom the discrimination has been directed the burden of seeking an upward revision of the taxes of other members of the class." *Id.*

Here, as in *Allegheny Pittsburgh Coal*, the Pennsylvania Constitution requires uniform state taxation. Pa. Const. art. VIII, §1. In *Nextel*, the Pennsylvania Supreme Court determined that the NLC's flat-dollar deduction limitation created a non-uniform classification in violation of the Pennsylvania Constitution. Equal protection requires the Commonwealth to remove the discrimination. *See Allegheny Pittsburgh Coal.* Both of the severability options remove the discrimination, thereby satisfying equal protection.

### c. Remedies Clause

The Remedies Clause of the Pennsylvania Constitution provides: "All courts shall be open; and every man for an injury done him in his lands, goods,

24

person or reputation shall have remedy by due course of law." Pa. Const. art. VIII, §1. Our Supreme Court has said: "the right to sue the Commonwealth for the recovery of money or taxes alleged to have been erroneously paid to it exists only by the grace of the Legislature." *Land Holding Corp. v. Board of Finance and Revenue*, 130 A.2d 700, 703 (Pa. 1957). "Where a State through its Legislature consents to be sued, the modes, terms and conditions of the statute conferring such privilege and authorizing refunds must be strictly construed and followed." *Id.*

Here, GM is exercising its right to pursue a tax refund consistent with the rights granted to it by the General Assembly. The "due course of law" includes the statutorily prescribed administrative review before F&R and the judicial review process. The court is "open" to GM and is considering GM's claims. In this regard, GM's rights under the Remedies Clause are being met. While GM is entitled to a remedy in this matter, it is not necessarily entitled to a refund under the Remedies Clause.

## C. Retroactivity of *Nextel*
### 1. Contentions

Lastly, we must address whether the remedy in this matter is applied prospectively or retroactively. The Commonwealth argues that, where the Pennsylvania Supreme Court invalidates a tax statute under the state constitution, as it did in *Nextel*, the decision takes effect as of the date of the decision and is not applied retroactively. *Oz Gas, Ltd. v. Warren Area School District*, 938 A.2d 274, 278 (Pa. 2007); *American Trucking Associations, Inc. v. McNulty*, 596 A.2d 784, 787 (Pa. 1991). The Commonwealth argues that any remedy in this case should be fashioned under this principle. Relying on *Chevron Oil Company v. Huson*, 404 U.S. 97 (1971) (plurality), the Commonwealth contends that if a court changes the

25

law and announces an entirely new principle of law, that court may continue to apply the old principle of law to events occurring before the change. The Commonwealth maintains that a retroactive application of the law is inapplicable here because *Nextel* announced a new principle of law. Prior to *Nextel*, the Pennsylvania courts have consistently held that the Uniformity Clause was satisfied in the corporate net income tax context where the same statutory rate was applied to the same tax base. The dollar limitations that were imposed in calculating the tax base had not been held to violate uniformity until the *Nextel* decision. The NLC's flat-dollar deduction limitation was unconstitutional because it resulted in varying effective tax rates. The Supreme Court established new law in holding for the first time that a flat-dollar limitation was unconstitutional, thus warranting prospective application. Under a prospective application of *Nextel* to the present case, GM is not entitled to a refund.

GM responds that the only way to achieve "meaningful backward-looking relief" as required by *McKesson* is by a retroactive application of *Nextel*. GM argues that the Commonwealth cannot defend prospective-only application under *Chevron* and its progeny, *Oz Gas* and *McNulty*. GM argues that Nextel did not establish a new principle of law. Rather, the Supreme Court in *Nextel* applied a straightforward reading of the Uniformity Clause, consistent with over 100 years of precedent, that the Uniformity Clause is satisfied when the same tax rate is applied and is not satisfied when the rate is not uniform. In *Nextel*, the Court held that the flat-dollar limitation on the NLC deduction produced a non-uniform statutory rate contrary to the Uniformity Clause. According to GM, this is not a new pronouncement of the law. Furthermore, the Commonwealth did not carry its burden on the other prongs of the *Chevron* test.

26

## 2. Analysis

In *Chevron*, the U.S. Supreme Court fashioned a three-factor test for determining when the relief should apply retroactively or prospectively. 404 U.S. at 106-07. Those three factors examine: (1) whether the decision establishes a new principle of law; (2) whether retroactive application of the decision will further the operation of the decision; and (3) the relevant equities. *Id.* In short, the Court held that if there is a change in law, due process may still be satisfied by the continued application of the old, long-standing principle of law up through the date of the change. *Id.* However, if there has been no change in law, a litigant is entitled, as a matter of due process of that law, to have the long-standing law applied to it. *Id.*

In *Oz Gas* and *McNulty*, the Pennsylvania Supreme Court applied the three-factor test from *Chevron*. In *Oz Gas*, Pennsylvania taxpayers had "for nearly 100 years . . . paid *ad valorem* taxes on oil and gas interests" in reliance on past precedent, which held that oil and gas was taxable as real estate. 938 A.2d at 279. The Pennsylvania Supreme Court's holding in *Independent Oil and Gas Association v. Board of Assessment Appeals of Fayette County*, 814 A.2d 180 (Pa. 2002) (*IOGA*), precluded counties from collecting taxes on oil and gas reserves that remain in the ground. *Oz Gas*, 938 A.2d at 276. With regard to whether *IOGA* should apply retroactively to past taxes, the Court determined that *IOGA* represented a departure from decades of taxation of oil and gas interest, upon which the taxing authorities had relied. *Oz Gas*, 938 A.2d at 283. "The decision in *IOGA* established a new principle of law in that, prior to the decision, these sorts of taxes were deemed collectible pursuant to statute and precedent." *Id.* The Court determined that the other two *Chevron* factors also supported a prospective-only holding. *Id.* "Applying *IOGA* retroactively would not forward the operation of the

27

decision because the decision speaks for itself and clearly establishes that the taxes are uncollectible going forward. And, finally, the equities weigh heavily in favor of prospective-only application." *Id.* The Court explained that requiring a refunding of the taxes would cause substantial financial hardship to the communities involved and the taxpayers would receive substantial relief from a prospective-only application.

Similarly, in *McNulty* the Pennsylvania Supreme Court determined that any relief due was prospective only. 596 A.2d at 789. There, a trucking association challenged Pennsylvania's axle tax and marker fees, which were assessed against common carriers. *Id.* at 784. The U.S. Supreme Court ruled that such taxes and fees, when charged to carriers engaged in interstate commerce, violated the Commerce Clause of the U.S. Constitution. *American Trucking Associations, Inc. v. Scheiner*, 483 U.S. 266 (1987).

In *McNulty*, the Pennsylvania Supreme Court was charged with determining whether the *Scheiner* decision entitled the trucking association to a refund of taxes previously paid. While the *McNulty* matter was pending on remand, the U.S. Supreme Court determined that *Scheiner* applied prospectively only. *American Trucking Associations, Inc. v. Smith*, 496 U.S. 167 (1990) (plurality opinion). Applying the *Chevron* test, the U.S. Supreme Court determined that: (1) the decision in *Scheiner* clearly established a new principle of law by declaring the highway taxes unconstitutional pursuant to the Commerce Clause; (2) retroactive application of the *Scheiner* decision would not forward the operation of the decision; and (3) the relevant equities dictated prospective application because the legislature did not believe the taxes to be unconstitutional, the taxing authorities collected taxes that the authorities reasonably believed were

28

valid, and refunding the taxes could deplete the state treasury. *Id.* at 179-82. In *McNulty*, the Pennsylvania Supreme Court embraced the logic employed in *Smith* and determined that the *Scheiner* decision applied prospectively only. 596 A.2d at 787.

Applying the foregoing here, with regard to the first prong, in *Nextel*, the Pennsylvania Supreme Court made it clear that, in finding that the net loss cap violated uniformity, it merely needed to apply existing case law to which it had "steadfastly adhered" for "over a century." *Nextel*, 171 A.3d at 696-97. The Supreme Court cited years of precedent for the principle that it has "consistently viewed as unconstitutional tax laws which . . . wholly exempt some of those taxpayers from paying tax." *Id.* at 697; *see*, *e.g.*, *Saulsbury* (holding that the Uniformity Clause proscribes the unequal treatment of certain individuals based upon their income); *Kelley v. Kalodner,* 181 A. 598 (Pa. 1935) (holding that a graduated-rate income tax violated the Uniformity Clause); *In re Cope's Estate*, 43 A. 79 (Pa. 1899) (holding that a flat $5,000 property exemption applicable to all estates for purposes of the Pennsylvania Inheritance Tax violated the Uniformity Clause as it resulted in the unjust, arbitrary and illegal classification of similarly situated taxpayers based solely on a difference in the amount of property in the estate). Unlike in *Oz Gas* and *McNulty*, the *Nextel* Court did not overrule prior precedent. Consequently, the Supreme Court in *Nextel* did not apply a new principle of law, but rather applied the long-standing principle that tax uniformity prohibits classification based on quantity of income. *Id.*

As for the second prong, the Commonwealth argues that a retroactive application would not forward the operation of the decision. It maintains that if the entire NLC provision is severed, a retroactive application would result in a higher

tax burden for GM because it would lose the benefit of the statutory net loss deduction of $2,000,000. The Commonwealth explains:

> [D]isallowing the NLC deduction entirely on a retroactive basis would not forward the operation of the decision because the decision could not be enforced retroactively. GM received the benefit of the statutory net loss deduction of $2,000,000 in calculating its tax liability. Disallowing the deduction entirely would actually result in a higher tax burden for GM. However, the Commonwealth recognizes that the three-year statute of limitations to issue an assessment has closed with respect to the present 2001 Tax Year.

Respondent's Brief at 19 (citations omitted). Conversely, if only the cap is severed, retroactive application would serve to equalize the tax positions of the two classes by reducing GM's tax liability to zero, which is the same tax position of the favored taxpayers. Equalizing the tax positions furthers the *Nextel* decision.

With regard to the third prong, even if *Nextel* had announced a new principle of law, the Commonwealth has not met its burden to show that it would be inequitable to apply that new principle retroactively. The Commonwealth argues that if the dollar cap is severed and the remedy is retroactively applied, it will face significant refund claims from similarly situated taxpayers seeking an unlimited NLC deduction.[16] The Commonwealth claims that this significant financial exposure favors prospective-only application. Indeed, it is difficult to

---

[16] The Commonwealth asserts that its total tax exposure would be $37,000,000. As GM points out, this figure is not part of the record developed before this Court. The only amounts in the record are the $738,760 tax paid by GM and $0 tax paid by the 15,395 other taxpayers. *See* S.F. Nos. 9, 14, 15. This matter is limited to GM and the 2001 Tax Year. "The applicability of a judicial pronouncement to other litigants or potential litigants is a matter of judicial discretion to be resolved on a case-by-case basis." *First National Bank of Fredericksburg v. Commonwealth*, 553 A.2d 937, 941 (Pa. 1989).

imagine any scenario involving a substantial tax question that would not have a multi-million dollar impact.[17] However, the Commonwealth did not present evidence regarding this tax burden beyond the refund it would owe GM. It has not shown that the Commonwealth's financial health will be impaired. Thus, it did not carry its burden of showing the inequities present here. We, therefore, conclude that *Chevron* does not prohibit retroactive application of a remedy in this case.

---

[17] Although we recognize that the Commonwealth may face significant refund claims from similarly situated taxpayers, we also recognize that the Commonwealth may see a tremendous increase in revenue from corporate net income tax. In response to the *Nextel* decision, the General Assembly amended the NLC provision for taxable year 2018 and onwards to include only a percentage cap. *See* Section 401(3)4.(c)(1)(A)(VII), (VIII) of the Tax Code, 72 P.S. §7401(3)4.(c)(1)(A)(VII), (VIII) (capping the deduction at 30 percent of taxable income for tax years beginning after December 31, 2017, and 35 percent for tax years beginning after December 31, 2018). This means that corporations that paid no corporate net income tax in previous years will now be paying tax.

Moreover, there are "a number of procedural protections a state could adopt to allow for sound fiscal planning while maintaining the ability to provide relief for taxes unlawfully collected." *Automobile Trade Association*, 596 A.2d at 796 (citing *McKesson*, 496 U.S. at 44). To wit:

> [I]n the future, States may avail themselves of a variety of procedural protections against any disruptive effects of a tax scheme's invalidation, such as providing by statute that refunds will be available to only those taxpayers paying under protest, or enforcing relatively short statutes of limitation applicable to refund actions. [("[T]he State might, for example, provide by statute that refunds will be available only to those taxpayers paying under protest or providing some other timely notice of complaint . . . .")]. Such procedural measures would sufficiently protect States' fiscal security when weighed against their obligation to provide meaningful relief for their unconstitutional taxation.

*Dunn*, 877 A.2d at 517 (quoting *McKesson*, 496 U.S. at 50) (citation omitted).

31

## IV. Conclusion

Upon review, we find that the General Assembly's intent is better served by severing the offending portion – the flat-dollar $2,000,000 cap – as opposed to striking the entire NLC provision. This remedy satisfies due process by providing "meaningful backward-looking relief," where striking the entire NLC does not. *See McKesson*, 496 U.S. 18, 42. Retroactive application is not precluded under *Chevron*. For these reasons, we reverse F&R's order and remand the matter to F&R to recalculate GM's corporate net income tax without capping the amount that it can take on its NLC and issue a refund for the 2001 Tax Year.

_____
MICHAEL H. WOJCIK, Judge

Judge Fizzano Cannon did not participate in the decision of this case.

32

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| General Motors Corporation, | : | |
| | : | |
| Petitioner | : | |
| | : | |
| v. | : No. 869 F.R. 2012 |
| | : | |
| Commonwealth of Pennsylvania, | : | |
| | : | |
| Respondent | : | |

# **O R D E R**

AND NOW, this 21st day of November, 2019, the order of the Commonwealth of Pennsylvania, Board of Finance and Revenue (F&R) dated November 6, 2012, is REVERSED, and this matter is REMANDED to F&R to recalculate General Motors Corporation's (Petitioner) corporate net income tax without capping the amount that it can take on its net loss carryover deduction and issue a refund for the tax year ended December 31, 2001. Unless exceptions are filed within thirty (30) days pursuant to Pa. R.A.P. 1571(i), this Order shall become final.[1]

_____
MICHAEL H. WOJCIK, Judge

---

[1] Petitioner's Application for Summary Relief, filed February 19, 2018, is dismissed as moot.

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

General Motors Corporation,      :
         Petitioner      :
         :
      v.      :    No. 869 F.R. 2012
         :    Argued: September 10, 2019
Commonwealth of Pennsylvania,      :
         Respondent      :


BEFORE:   HONORABLE P. KEVIN BROBSON, Judge
            HONORABLE MICHAEL H. WOJCIK, Judge
            HONORABLE BONNIE BRIGANCE LEADBETTER, Senior Judge


**CONCURRING AND DISSENTING**
**OPINION BY JUDGE BROBSON**       **FILED: November 21, 2019**


I agree with the majority's analysis and conclusion with respect to the constitutionality of the net loss carryover (NLC) deduction provision for the tax year ending December 31, 2001 (2001 Tax Year), which caps the deduction at $2 million.[1] The cap discriminates against taxpayers based solely on the amount of income and, therefore, violates the Uniformity Clause of the Pennsylvania Constitution.[2] *Nextel Commc'ns of the Mid-Atlantic, Inc. v. Dep't of Revenue*, 171 A.3d 682, 696 (Pa. 2017) (*Nextel II*), *cert. denied*, 138 S. Ct. 2635 (2018). I, therefore, concur with this portion of the majority's analysis and disposition.

As much as I would like to agree with the majority's severance analysis and its decision to award General Motors Corporation (GM) an *unlimited* NLC

---

[1] Section 401(3)4.(c)(1)(A)(I) of the Act of March 4, 1971, P.L. 6, *as amended*, 72 P.S. § 7401(3)4.(c)(1)(A)(I).

[2] Pa. Const. art. VIII, § 1.

deduction for the 2001 Tax Year, I must respectfully dissent as to this portion of the majority's decision. For the reasons set forth below, I believe that the Pennsylvania Supreme Court's decision in *Nextel II* precludes this Court from granting this relief to GM.

In *Nextel Communications of Mid-Atlantic, Inc. v. Commonwealth*, 129 A.3d 1 (Pa. Cmwlth. 2015) (en banc) (*Nextel I*), this Court addressed a Uniformity Clause challenge to the NLC deduction provision for the tax year ending December 31, 2007 (2007 Tax Year), found in Section 401(3)4.(c)(1)(A)(II) of the Tax Reform Code of 1971 (Tax Reform Code).[3] The taxpayer in that case, Nextel, claimed that the two statutory caps on the NLC deduction for that year—the greater of (1) 12.5% of taxable income or (2) $3 million—worked in tandem to allow taxpayers with taxable income below $3 million the opportunity to fully offset their corporate net income tax liability for 2007 through the NLC deduction, while larger taxpayers (taxable incomes above $3 million), like Nextel, could not. This inequity, Nextel claimed, created separate classes of taxpayers based solely on income level in violation of the Uniformity Clause.

In *Nextel I*, this Court held that the NLC deduction provision for the 2007 Tax Year violated the Uniformity Clause, at least with respect to Nextel. *Nextel I*, 129 A.3d at 8-11. Rather than look to how to modify the statutory provision to remove the constitutional infirmity, by striking or severing the offending provision from the statute, the Court focused instead on how to remedy the wrong to *Nextel*. Indeed, on the separate question of modifying the statutory provision, we observed:

> [S]triking the $3 million cap . . . would only serve to highlight the fact that while Nextel paid what it was

_____

[3] Act of March 4, 1971, P.L. 6, *as amended*, 72 P.S. § 7401(3)4.(c)(1)(A)(II).

supposed to pay, many corporate net income taxpayers in the 2007 Tax Year benefitted from the discriminatory cap and thus *underpaid* their corporate net income taxes—*i.e.*, they benefitted from the unconstitutional provision. Without more, then, an order declaring the $3 million cap unconstitutional and striking it from the statute does not remedy the constitutional violation.

*Nextel I*, 129 A.3d at 13 (emphasis in original).

On the question of remedy, we first noted the general similarities between Uniformity Clause challenges and challenges under the Equal Protection Clause to the United States Constitution.[4] Relying on precedent from the United States Supreme Court, the Pennsylvania Supreme Court, and this Court,[5] we opined that Nextel was entitled to some form of affirmative relief to address the constitutional harm that it suffered. The only appropriate way to address the inequitable treatment "was to place the discriminated taxpayer in the same position as the benefitted taxpayers." *Id.* Because the unconstitutional $3 million cap *benefitted* small taxpayers by allowing them to reduce their tax liability to $0 in 2007, but prevented larger taxpayers from doing the same, we held that Nextel must be allowed to also reduce its tax liability for the 2007 Tax Year to $0, reasoning:

> Under *Molycorp*, *Iowa–Des Moines National Bank*, and *Tredyffrin-Easttown School District*, the unequal treatment suffered by Nextel must be remedied, and it can only be remedied in one of two ways—the favored taxpayers pay more or Nextel pays less. The latter is the only practical solution. Nextel seeks a refund of corporate net income tax paid in 2007. This is an appropriate remedy. Like similarly-situated taxpayers with $3 million or less taxable income in the 2007 Tax Year, Nextel should

---

[4] U.S. Const. amend. XIV, § 1.

[5] *Iowa-Des Moines Nat'l Bank v. Bennett*, 284 U.S. 239 (1931); *Cmwlth. v. Molycorp, Inc.*, 392 A.2d 321 (Pa. 1978) (citing *Iowa-Des Moines Nat'l Bank* with approval); *Tredyffrin-Easttown Sch. Dist. v. Valley Forge Music Fair, Inc.*, 627 A.2d 814 (Pa. Cmwlth.), *appeal denied*, 647 A.2d 513 (Pa. 1993).

be permitted under the NLC deduction provision to reduce its taxable income to $0 by virtue of its positive net operating loss position that tax year.

*Id.*

In *Nextel II*, the Pennsylvania Supreme Court affirmed in part and reversed in part. In doing so, the Supreme Court issued three distinct holdings. First, it agreed with this Court that the NLC deduction provision for the 2007 Tax Year, particularly the $3 million cap on the allowed deduction, violated the Uniformity Clause. *Nextel II*, 171 A.3d at 698-701. Second, it engaged in a severability analysis, citing Section 1925 of the Statutory Construction Act of 1972 (Statutory Construction Act), 1 Pa. C.S. § 1925.[6] *Id.* at 701-05.

Upon reviewing the legislative history surrounding the various iterations of the NLC deduction in Pennsylvania, the Pennsylvania Supreme Court opined:

> This legislative history establishes that the General Assembly first granted the deduction without any cap at all, but abandoned this approach *based on its determination that such an uncapped deduction had significant deleterious consequences for our Commonwealth's fiscal health*. However, our legislature perceived that the deduction provided some public benefit by encouraging investment in the development of new

---

[6] Section 1925 of the Statutory Construction Act provides:

The provisions of every statute shall be severable. If any provision of any statute or the application thereof to any person or circumstance is held invalid, the remainder of the statute, and the application of such provision to other persons or circumstances, shall not be affected thereby, unless the court finds that the valid provisions of the statute are so essentially and inseparably connected with, and so depend upon, the void provision or application, that it cannot be presumed the General Assembly would have enacted the remaining valid provisions without the void one; or unless the court finds that the remaining valid provisions, standing alone, are incomplete and are incapable of being executed in accordance with the legislative intent.

technologies, as well as the acquisition of the physical infrastructure necessary to implement those technologies. *Thus, the legislature reintroduced the deduction in 1994, but attempted to avert the excessive drain on the public fisc the prior unlimited deduction had caused by imposing a cap on the amount of this deduction which a corporation could take in a given tax year, and the legislature has steadfastly maintained this cap in various forms for the last 23 years.* Thus, the overall structure of the NLC reflects *the legislature's intent to balance* the twin policy objectives of encouraging investment (by allowing corporations to deduct some of the losses they sustain when making such investments against their future revenues), and ensuring that the Commonwealth's financial health is maintained (through the capping of the amount of this deduction).

*Id.* at 704 (emphasis added) (citation omitted). In short, the Pennsylvania Supreme Court held that the intent of the General Assembly since reintroducing the NLC deduction has been to allow the deduction *but with limits*. In accordance with this legislative intent, the Supreme Court severed the $3 million cap on the deduction for the 2007 Tax Year, leaving in place the provision that would limit the deduction to 12.5% of taxable income: "Thus, each corporation will be entitled to avail itself of a [NLC] deduction, as the legislature intended, but such deduction will be equally available to all corporations during that year, no matter what their taxable income." *Id.*

As a result of its severability analysis, the Supreme Court held that the remedy awarded by this Court in *Nextel I*, allowing Nextel to take an unlimited NLC deduction for the 2007 Tax Year, "contravene[d] the legislature's intent to limit this deduction." *Id.* at 705. The Court reasoned:

In order to avoid a repeat of the budgetary damage caused by the unlimited net loss deduction which was in effect from 1980-1991, the legislature has, since the reinstatement of this deduction in 1994, consistently required that it be capped. *To remove all caps and allow*

> *unlimited net loss deductions would be clearly contrary to the wishes of the General Assembly.*

*Id.* (emphasis added).

Third, and finally, the Supreme Court rejected this Court's remedy analysis, which was grounded in equal protection concerns. Essentially, the Pennsylvania Supreme Court held that, as a result of its severance analysis, the Commonwealth did not owe Nextel a refund because, under the NLC deduction provision *as revised* by the Supreme Court for the 2007 Tax Year, "[Nextel] is subject to the same tax liability for tax year 2007 as previously assessed by the Department." *Id.* Stated otherwise, "[h]ere, under the NLC [deduction provision], *as severed*, there was no overpayment of corporate taxes by Nextel, as it owes exactly what the Revenue Department previously assessed."[7] *Id.* (emphasis added).

Based on the Pennsylvania Supreme Court's decision in *Nextel II*, and using the words of the Supreme Court, I am constrained to conclude that the majority's decision to afford GM an *unlimited* NLC deduction for the 2001 Tax Year by striking *the only limit* that the General Assembly placed on that deduction—*i.e.*, the $2 million cap, "contravenes the legislature's intent to limit this deduction." *Id.* The Pennsylvania Supreme Court was very clear in its severance and remedy analysis in *Nextel II*. Because the General Assembly did not intend to grant an

---

[7] I respectfully disagree with the Supreme Court's focus on Nextel's tax liability pre-severance and post-severance for purposes of determining whether Nextel was entitled to any affirmative relief. Nextel never benefitted from the severed cap; rather, it was the smaller taxpayers that benefitted in the 2007 Tax Year from the unconstitutional cap. It is this inequity, that being the inequity between those that benefitted from the unconstitutional scheme (the smaller taxpayers) and those that suffered from it (larger taxpayers like Nextel), that courts must remedy when dealing with successful Uniformity Clause/equal protection challenges. Although it provided some form of "prospective" relief by revising the NLC deduction provision for the 2007 Tax Year, the Supreme Court's decision in *Nextel II* did nothing to remedy the inequitable treatment suffered by Nextel.

unlimited NLC deduction in any version of the provision since its reintroduction in 1994, the courts cannot grant an unlimited deduction without violating legislative intent.

The majority deftly attempts to escape the grip of the Pennsylvania Supreme Court's decision in *Nextel II* by contending that striking the cap for the 2001 Tax Year at least furthers the General Assembly's "dominant" intent to promote business investment in the Commonwealth. (Maj. Op. at 13-14.) Essentially, the majority holds that for Tax Year 2001, given a choice between an unlimited NLC deduction or no deduction at all, the General Assembly would choose an unlimited deduction. The legislative history recounted by the Pennsylvania Supreme Court in *Nextel II*, and the Supreme Court's holdings in *Nextel II* on the question of legislative intent, however, do not support the majority's hypothesis. Indeed, as recounted above, Pennsylvania used to have an unlimited NLC deduction, but the General Assembly scrapped it out of concern for the fiscal health of the Commonwealth. When the General Assembly brought the deduction back in 1994, it put a cap on the deduction. Every iteration of the deduction since has had some form of cap on it. For this reason, in *Nextel II*, the Supreme Court expressly held that an unlimited cap is "clearly contrary to the wishes of the General Assembly." *Nextel II*, 171 A.3d at 705.

The bottom line here is that, as much as I prefer the majority's disposition on the question of remedy, we are constrained by *Nextel II*. Under that precedent, we cannot sever the $2 million cap from the NLC deduction provision and allow GM to take an unlimited NLC deduction for the 2001 Tax Year. To the extent we may take any action with respect to modifying the language of the deduction under Section 1925 of the Statutory Construction Act, our only option, in

keeping with the General Assembly's intent to allow *only limited NLC deductions*, is to strike the deduction in its entirety for the 2001 Tax Year. As for remedying the harm to GM, again the Supreme Court's decision in *Nextel II* constrains the Court. We cannot compel the Commonwealth to refund anything to GM, because, as in *Nextel II*, striking the entirety of the NLC deduction provision for the 2001 Tax Year means that GM did not overpay its corporate net income tax for the 2001 Tax Year.

_____
P. KEVIN BROBSON, Judge
